UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

U.S. BANK NATIONAL ASSOCIATION, )
                                   )
        Plaintiff,          )     Case No. 12-cv-5598
                                   )
        v.                  )     Hon. Milton I. Shadur
                                   )
CAPITAL REALTY & DEVELOPMENT, )     Hon. Jeffery Cole
LLC and RICHARD P. TURASKY, JR., )
                                   )
        Defendants.      )

## DECLARATION OF MICHAEL JOHNSON

        Michael Johnson declares under penalty of perjury under the laws of the United States of America that the following facts are based on his personal knowledge and review of records kept in the ordinary course of business and are true and correct, except as to the matters stated on information which he verily believes are true, as he competently would testify if called as a witness at trial:

        1.      I am familiar with Yong-Ho Michael Kang, Richard P. Turasky, Jr. and Whisper Capital Group, LLC ("Whisper Capital").

        2.      I am the president of 1141566 Ontario Inc., a Canadian incorporated investment company.

        3.      In September 2013, I negotiated and consummated 1141566 Ontario Inc.'s purchase of the four (4) Whisper Capital notes originally issued May 1, 2011. True and correct copies of the Whisper Capital Notes are attached hereto collectively as Exhibit 1 (the "Whisper Capital Notes"). A true and correct copy of the "Transfer of Notes From Company to Purchase" agreement is attached hereto as Exhibit 2.

4. The only person with whom I negotiated the purchase of the Whisper Capital Notes was Christopher M. Wong, the financial consultant for Chan Lit Chow, Chan Lit San, NG HEI, and Wong Ching Vienna—the then sole holders of the Whisper Capital Notes. A true and accurate copy of the consultant agreement between 1141566 Ontario Inc and Christopher M. Wong is attached hereto as Exhibit 3.

5. Michael Kang had zero ownership or interest in the Whisper Capital Notes at the time 1141566 Ontario Inc. purchased them from Chan Lit Chow, Chan Lit San, NG HEI, and Wong Ching Vienna in September 2013.

6. After 1141566 Ontario Inc. purchased the Whisper Capital Notes, I sent a letter to Richard Turasky, the manager of Whisper Capital, notifying him of the purchase and alerting him that 1141566 Ontario Inc. would reach out to him to request full reconciliation of accounts and investments in Whisper Capital. A true and accurate copy of my letter to Mr. Turasky is attached hereto as Exhibit 4

7. 1141566 Ontario Inc. is currently the sole holder of the Whisper Capital Notes and has not transferred, assigned, conveyed or otherwise encumbered any interest therein..

FURTHER AFFIANT SAYETH NOT

Dated: _____                    _____
                                                     Michael Johnson

Sworn to and signed before me, a notary public, this ____/81____ day of _May_, 2015

_____
Notary Public


DENISE K. AIKEN
NOTARY PUBLIC - ARIZONA
MARICOPA COUNTY
My Comm. Exp.: September 14, 2017

EXHIBIT "1"

## NOTE PURCHASE AGREEMENT

THIS NOTE PURCHASE AGREEMENT (the *"Agreement"*) is made effective as of May 1 2011 (the *"Effective Date"*) by and among Whisper Capital Group L.L.C., an Delaware limited liability company (the "Company"), and the persons named on the Schedule of Investors attached hereto (individually an *"Investor"* and collectively, the *"Investors"*).

### RECITAL

WHEREAS, in order to provide the Company with capital needed to conduct its business, the Company desires to borrow and the Investors are willing to loan to the Company up to an aggregate principal amount of Twenty Million Dollars ($20,000,000) (the *"Maximum Loan Amount"*) on the terms set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises, representations, warranties, and covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. AMOUNT AND TERMS OF THE LOAN

   Subject to the terms of this Agreement, each Investor agrees to loan to the Company at the Closing (as hereinafter defined) the amount set forth beneath such Investor's name on the Signature Page (each a *"Loan Amount"* and collectively the *"Loan"*) against the issuance and delivery by the Company of a promissory note for such amount, in substantially the form attached hereto as <u>Exhibit A</u> (each a *"Note"* and collectively the *"Notes"*). The Loan shall not exceed the Maximum Loan Amount, in the aggregate.

   **THE PARTIES ACKNOWLEDGE THAT THE COMPANY IS CURRENTLY ORGANIZED AS A LIMITED LIABILITY COMPANY AND THAT IT MAY CONVERT TO A "C-CORPORATION" IN THE FUTURE.** In such event, the Notes shall be assumed by and become the obligation of the C-Corporation.

2. THE CLOSING; DELIVERIES AT CLOSING.

   2.1    <u>Closing</u>. The closing of a sale and purchase of a Note (the *"Closing"*) shall be held on the Effective Date and at such other times as the Company and an Investor shall agree (the *"Closing Date"*). A separate Closing shall take place upon each purchase of a Note by an Investor; provided that no closing shall take place after June 1, 2012.

   2.2    <u>Delivery</u>. At a Closing (i) an Investor shall deliver to the Company a check or wire transfer in immediately available funds in the amount of such Investor's Loan Amount; (ii) the Company shall issue and deliver to the Investor a Note in favor of such Investor payable

in the principal amount of such Investor's Loan Amount and (iii) the Schedule of Investors shall be amended to reflect the name and amount invested by the Investor and the applicable Closing Date.

3. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE COMPANY.

The Company hereby represents and warrants to each Investor that the following statements are true and correct in all material respects.

3.1    Organization, Good Standing and Qualification. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own its properties and assets and to carry on its business as now conducted and as presently proposed to be conducted.

3.2    Corporate Power. The Company has all requisite corporate power to execute and deliver this Agreement, issue the Note and carry out and perform its obligations under the terms of this Agreement and under the terms of the Note.

3.3    Due Authorization. All action on the part of the Company, its managers and members necessary for the authorization, execution, delivery of, and the performance of all obligations of the Company under this Agreement, and all other agreements executed in connection with this Agreement and the Note have been taken or will be taken prior to the Closing. This Agreement and the Note, when executed and delivered by the Company, shall constitute the valid and legally binding obligations of the Company, enforceable in accordance with their terms, except as may be limited by (a) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights, the relief of debtors, (b) the effect of rules of law governing the availability of equitable remedies and (c) with respect to rights to indemnity, subject to federal and state securities laws.

3.4    Valid Issuance of the Notes. Each Note, when issued in compliance with the provisions of this Agreement, will be validly issued, fully paid and nonassessable and free of any liens or encumbrances.

3.5    Governmental Consents. No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state, or local governmental authority by the Company is required in connection with the consummation of the transactions contemplated by this Agreement, or any agreement contemplated herein except for such qualifications or filings under the Securities Act of 1933 (the "1933 Act") and the regulations thereunder and all other applicable securities laws of the United States as may be required in connection with the transactions contemplated by this Agreement. All such qualifications will be effective on or prior to each Closing and all such filings will be made within the time prescribed by applicable law.

3.6    Compliance with Laws. To its knowledge, the Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or

2

the ownership of its properties, the violation of which would materially and adversely affect the business, assets, liabilities, financial condition, operations or prospects of the Company.

3.7 <u>Compliance with Other Instruments</u>. To its knowledge, the Company is not in violation or default of any term of its Articles of Organization or Operating Agreement, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a material adverse effect on the Company. The execution, delivery and performance of this Agreement and the Note, and the consummation of the transactions contemplated hereby or thereby will not result in any such violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties. Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder.

3.8 <u>Litigation</u>. To the Company's knowledge, there is no action, suit, proceeding, claim, arbitration or investigation pending or threatened against the Company, its activities, properties or assets or, to the best of the Company's knowledge, against any manager, officer, or employee of the Company in connection with such manager's officer's, or employee's relationship with, or actions taken on behalf of, the Company.

## 4. REPRESENTATIONS, WARRANTIES AND CERTAIN AGREEMENTS OF INVESTORS.

Each Investor, by executing this Agreement, does hereby represent, warrant and/or agree as follows (the use with respect to an Investor of the first person pronouns "I", "me", "mine" or "my" shall refer to an individual, corporation, limited liability company, partnership or other entity-form, as the case may be.)

4.1 <u>Adequate Disclosure and Review of and Access to Information</u>. I have completed my own independent due diligence investigation of the Company and believe that I am familiar with and fully aware of the Company's business operations, current financial condition and prospects as well as the significant risks associated with its business. Such investigation included an in-depth interview with a senior executive officer of the Company during which we discussed risk and other factors that will influence the Company's operations and business prospects.

4.2 <u>Purchase for Own Account</u>. I am acquiring the Note with my own funds and for my own account and beneficial interest for investment and not as a nominee or agent and not for the account of any other person. On acceptance of this Agreement by the Company, no person other than I will have any interest, beneficial or otherwise, in the Note. I am not obligated

3

to transfer to any other person nor do I have any agreement or understanding to do so. I am acquiring the Note for investment and for an indefinite period, not with a view to the sale or distribution of any part or all thereof by public or private sale or other disposition.

        4.3    <u>Speculative Investment, Ability to Assume Financial Risk</u>. I am aware of and understand that a purchase of the Note is a speculative investment which involves a high degree of risk of loss by me of my entire investment. I am able to assume the economic risks as holder of the Note and could absorb a complete loss on such transaction without significantly affecting my financial well-being.

        4.4    <u>No Representations/Forward-Looking Statements</u>. Except as provided herein, I am relying exclusively upon my own due diligence and not on representations or warranties concerning the Company, its products, prospects or financial condition, express or implied.

        4.5    <u>Legends</u>. I am aware and agree that the Note will bear the following legend:

WHISPER CAPITAL GROUP L.L.C., AN DELAWARE LIMITED LIABILITY COMPANY (THE "<u>COMPANY</u>"), IS AN EARLY STAGE COMPANY WITH A LIMITED OPERATING HISTORY. AN INVESTMENT IN THE COMPANY INVOLVES A HIGH DEGREE OF RISK AND IS VERY SPECULATIVE. THERE CAN BE NO ASSURANCE THAT ANY SUCH INVESTMENT IN THE COMPANY CAN OR EVER WILL: (A) BE RECOVERED, (B) RESULT IN ANY PAYMENT TO THE LENDER (AS DEFINED BELOW) OR (C) PROVIDE THE LENDER LIQUIDITY. PARTICIPATING IN THIS INVESTMENT COULD RESULT IN A COMPLETE LOSS OF ANY SUCH INVESTMENT IN THE COMPANY. BY PARTICIPATING IN THIS OFFERING, THE LENDER IS REPRESENTING TO THE COMPANY THAT HE, SHE OR IT IS ABLE TO BEAR THE SUBSTANTIAL ECONOMIC RISKS OF AN INVESTMENT IN THIS NOTE FOR AN INDEFINITE PERIOD OF TIME, HAS NO NEED FOR LIQUIDITY IN SUCH INVESTMENT AND, AT THE PRESENT TIME, COULD AFFORD A COMPLETE LOSS OF SUCH INVESTMENT.

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>SECURITIES ACT</u>") OR UNDER ANY STATE SECURITIES LAWS (COLLECTIVELY WITH THE SECURITIES ACT, THE "<u>ACTS</u>") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT (A) IN ACCORDANCE WITH THE TERMS OF THIS NOTE AND (B) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER THE ACTS OR AN OPINION OF COUNSEL, IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY, THAT AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACTS IS AVAILABLE FOR SUCH OFFER, SALE, TRANSFER, PLEDGE OR HYPOTHECATION.

4

4.6     Financial Experience. I have sufficient knowledge and experience in business and financial matters to evaluate the risks of an investment in the Note.

4.7     Accredited Investor. I acknowledge and warrant that I am an "accredited investor" (as defined in Rule 501 of Regulation D of the 1933 Act) and have completed the Investor Suitability Questionnaire on Exhibit B.

4.8     Additional Information.     I have had the opportunity, at minimal inconvenience, to ask questions of and obtain from the Company any additional information, to the extent possessed or obtainable without unreasonable effort or expense, necessary to evaluate the merits and risks of an investment in the Note. There is no additional information that I wish to obtain from the Company or from any other source with respect to the Note or the Company and I have concluded, based on information presented to me and my own understanding of investments of this nature, that I wish to purchase the Note.

4.9     No Regulatory Review. I understand that the Note has not been registered under the 1933 Act or the securities laws of any state, and therefore, I must bear the economic risks of the investment for an indefinite period of time since the Note cannot be sold or offered for sale unless it is subsequently so registered or an exemption from such registration is available.

4.10     Non Findings or Due Diligence. I am aware that no federal or state agency has made any finding or determination as to the fairness of the Notes, nor any recommendation or endorsement of the Notes.   I AM AWARE AND UNDERSTAND THAT NO DUE DILIGENCE HAS BEEN PERFORMED BY ANY COUNSEL OR ACCOUNTANT FOR THE COMPANY WITH RESPECT TO THE NOTES.

4.11     Restricted Securities. I have been advised that the Note has not been registered under the 1933 Act, not registered or qualified under any other securities law, on the ground, among others, that the Notes will be issued by the Company in connection with a transaction that does not involve any public offering within the meaning of Section 4(2) of the 1933 Act, under the rules and regulations of the Securities and Exchange Commission thereunder and under comparable exemptive provisions of the securities laws, rules and regulations of other jurisdictions.

4.12     Specific Disclosures. I understand that:

A.   The Company is a newly formed business that has limited operating history and revenues.

B.     The purchase of a Note is a speculative investment which involves a high degree of risk of loss by me of my entire investment.

C.     No audited or reviewed financial statements are being furnished with respect to the Company.

D.    The Company competes in a highly competitive market and in many cases its competitors are better financed and currently have more established market awareness and distribution than the Company.

E.    The Company will be dependent on the availability of its senior executive officers who will be responsible for the overall management of the Company and the development and marketing strategies of its research.

F.    The proceeds from the sale of the Note will fund the Company's operations for only a limited period of time.

4.13    No Solicitation. The offer to purchase the Note was directly communicated to me by the Company and at no time was I presented with or solicited by a leaflet, public promotional meeting, newspaper or magazine article, radio or television advertisement or any other form of general advertising or general solicitation.

4.14    Authorization. This Agreement constitutes my valid and legally binding obligation, enforceable in accordance with its terms except as may be limited by (a) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (b) the effect of the rules of law governing the availability of equitable remedies. I represent that I have full power and authority to enter into and perform this Agreement and all other agreements contemplated herein.

4.15    Investment Experience. I understand that the purchase of a Note involves a substantial risk. I (a) have experience as an investor in securities of companies in the development stage and acknowledge that I am able to fend for myself, can bear the economic risk of an investment in a Note and have such knowledge and experience in financial or business matters that I am capable of evaluating the merits and risks of this investment or (b) have a preexisting personal or business relationship with the Company and certain of its officers, directors or controlling persons of a nature and duration that enables me to be aware of the character, business acumen and financial circumstances of such persons and have had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of a Note.

4.16    Further Limitations on Disposition. Without in any way limiting the representations set forth above, I further agree not to make any disposition of all or any portion of the Note unless and until:

(a)    There is then in effect a registration statement under the 1933 Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(b)    I have notified the Company of the proposed disposition and have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and, if reasonably requested by the Company, I shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will

not require registration under the 1933 Act or any applicable state securities laws, provided that no such opinion shall be required for dispositions in compliance with Rule 144 under the 1933 Act, except in extraordinary circumstances; or

(c)    Notwithstanding the provisions of paragraphs (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by me by gift, will or intestate succession to any spouse or lineal descendants or ancestors, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were the Investor hereunder.

4.17    Confidentiality.    I agree that I shall keep confidential and shall not use, disclose or divulge for a period of two years after receipt any information which I may obtain from the Company, pursuant to financial statements, reports and other materials submitted by the Company as required hereunder or under any other documents, unless such information is known, or until such information becomes known, to the public through no fault of mine or my agents, or unless the Company gives written consent to my release of such information, except that no such written consent shall be required (and I shall be free to release such information) if such information is to be provided to my counsel or accountant; provided that any such counsel or accountant shall acknowledge in writing to the Company that he or she is bound by the provisions of this Section 4.17. Notwithstanding the foregoing, this Section 4.17 shall not apply (a) to information which I learn from a third party with the right to make such disclosure, provided I comply with the restrictions imposed by the third party, (b) to information which is in my possession prior to the time of disclosure by the Company and not acquired by me under a confidentiality obligation, (c) to the minimum extent (after requesting and pursuing confidential treatment to the extent reasonably possible) I am required to disclose such information by law or a governmental regulatory authority, and (d) to the minimum extent (after requesting and pursuing confidential treatment to the extent reasonably possible) I am required to disclose such information by court order.

5.  MISCELLANEOUS.

5.1    Survival of Warranties.    The representations, warranties and covenants of the Company and each Investor contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of the Investor, his counsel or the Company, as the case may be.

5.2    Successors and Assigns.    The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

5.4    Governing Law.    This Agreement shall be governed by and construed under the internal laws of the State of Arizona without giving effect to conflict of laws or principles.

7

     5.5    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

     5.6    <u>Headings</u>. The headings and captions used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs, and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto, all of which exhibits are incorporated herein by this reference.

     5.7    <u>Notices</u>. Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively given upon personal delivery to the party to be notified, upon receipt when sent by telex, electronic mail (email) or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, or five (5) days after having been sent by registered or certified mail, postage prepaid; or one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Company at 385 Airport Rd. Suite 100, Elgin, Illinois 60123, and to the Investor at the address shown on the Signature Page or at such other address as the parties may designate by giving ten (10) days advance written notice to the other parties hereto.

     5.8    <u>Attorneys' Fees</u>. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

     5.9    <u>Expenses</u>. Each party will pay its own costs and expenses in connection with the transactions contemplated hereby.

     5.10    <u>Amendments and Waivers</u>. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company.

     5.11    <u>Severability</u>. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision(s) shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

     5.12    <u>Entire Agreement</u>. This Agreement, together with all exhibits and schedules hereto, constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, agreements, understandings duties or obligations between the parties with respect to the subject matter hereof.

5.13    Further Assurances. From and after the date of this Agreement, upon the request of Investor or the Company, the Company and the Investor shall execute and deliver such instruments, documents or other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement.

5.14    Delays or Omissions. No delay or omission to exercise any right, power or remedy accruing to Investor, upon any breach or default of the Company under this Agreement, shall impair any such right, power or remedy of Investor nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any holder of any breach or default under this Agreement, or any waiver on the part of Investor of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to Investor, shall be cumulative and not alternative.

9

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

COMPANY

Whisper Capital Group L.L.C.

By: _____

Its: _____

INVESTOR

_____

114798962

<u>EXHIBIT B</u>

INVESTOR SUITABILITY QUESTIONNAIRE

(ALL INFORMATION WILL BE TREATED CONFIDENTIALLY)

_____
_____
_____

Dear Sirs,

     This information is being furnished to you in connection with my proposed loan to Whisper Capital Group L.L.C. (the "*Company*") of $20,000,000 against the issuance and delivery by the Company of a promissory note for such amount (a "*Note*").

**ALL INVESTORS MUST INITIAL THE FOLLOWING LINE:**

     I, XXXX, understand that the following representations are made for the purpose of determining whether I qualify as an "accredited investor" as that term is defined by the Securities and Exchange Commission for the purpose of inducing the issuance of the Note to me. If I do not initial any of the statements below, I will not be considered an accredited investor, and the Company will determine, in its sole discretion, if I am otherwise eligible. I hereby represent that any statements initialed below are true, accurate and complete in all respects. I understand that a misrepresentation may constitute a violation of law, and that any person who suffers damage as a result of a false representation may have a claim against me for damages.

     In accordance with the foregoing, the following representations and data are hereby given (<u>please initial where indicated and complete the information on both pages of this Questionnaire</u>):

I.    Accredited Investor Representation

    A.    I certify that I am an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended (the "*Act*") because (select one or more of the following):

           ✓ I have a net worth (or joining net worth with my spouse) in excess of $ 3 million .

           _____ I have had individual income in excess of $_____ in each of the two most recent years (or joint income with my spouse in excess of $_____ in each

11

of those years) and have a reasonable expectation of reaching the same income level in the current year.

_____ I am an entity (LLC, partnership, corporation, or other business organization) in which all of the equity owners are accredited.

_____ I am a trust with total assets in excess of $_____, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as defined in Rule 506(b) of Regulation D of the Act.

_____ I am a director or executive officer of the Company.

_____ I am an organization described in Section 501(c)(3) of the Internal Revenue Code, a Company, a Massachusetts or similar business trust, or a partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $_____.

____✓____ I meet one of the other definitions of an "accredited investor" set forth in Rule             501(a).             Please             identify:
_____

B. **Please initial one** of the following statement:

____✓____ I have such knowledge in financial and business matters as to be capable of evaluating the relative merits and risks of an investment in the Note, and am not utilizing a purchaser representative in connection with evaluating such merits and risk. The information contained in this Questionnaire is offered as evidence of such knowledge and experience.

_____ I do NOT have such knowledge in financial and business matters as to be capable of evaluating the relative merits and risks of an investment in the Note.

C. **Please initial** next to each of the following statements:

____✓____ I am willing and able to bear the economic risk of an investment in the Note during the expected life of the Company. In making this statement, consideration has been given to whether I could afford the risks of loss inherent in investment in securities. I offer the information below in this Questionnaire as evidence of my ability to bear the economic risk.

____✓____ A Note will be solely for my own account and not for the account of any other person or with a view to any resale or distributions thereof.

____✓____ My commitment to illiquid investments in relation to my net worth and the acquisition of the Note (which are illiquid) will not cause my overall commitment to illiquid securities to be excessive.

12

_____ My financial resources are such that I can pay (without consideration of the amounts invested in the Note) any taxes due on my allocable share of gains and income from the Note.

_____ I represent that (a) the information herein is complete and accurate and may be relied upon by you, and (b) that I will notify you of any material change in any of such information occurring prior to acceptance of my subscription.

In Witness Whereof, I have executed this Purchaser Suitability Questionnaire this _____ day of _____, 200__, and declare under oath that it is truthful and correct.

_____
Signature of Purchaser

_CHAN  LIT  CHOW_
Name of Purchaser

13

NG   HEI

# NOTE PURCHASE AGREEMENT

THIS NOTE PURCHASE AGREEMENT (the "*Agreement*") is made effective as of May 1 2011(the "*Effective Date*") by and among Whisper Capital Group L.L.C., an Delaware limited liability company (the "Company"), and the persons named on the Schedule of Investors attached hereto (individually an "*Investor*" and collectively, the "*Investors*").

## RECITAL

WHEREAS, in order to provide the Company with capital needed to conduct its business, the Company desires to borrow and the Investors are willing to loan to the Company up to an aggregate principal amount of Twenty Million Dollars ($20,000,000) (the "*Maximum Loan Amount*") on the terms set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises, representations, warranties, and covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. AMOUNT AND TERMS OF THE LOAN

Subject to the terms of this Agreement, each Investor agrees to loan to the Company at the Closing (as hereinafter defined) the amount set forth beneath such Investor's name on the Signature Page (each a "*Loan Amount*" and collectively the "*Loan*") against the issuance and delivery by the Company of a promissory note for such amount, in substantially the form attached hereto as Exhibit A (each a "*Note*" and collectively the "*Notes*"). The Loan shall not exceed the Maximum Loan Amount, in the aggregate.

THE PARTIES ACKNOWLEDGE THAT THE COMPANY IS CURRENTLY ORGANIZED AS A LIMITED LIABILITY COMPANY AND THAT IT MAY CONVERT TO A "C-CORPORATION" IN THE FUTURE. In such event, the Notes shall be assumed by and become the obligation of the C-Corporation.

2. THE CLOSING; DELIVERIES AT CLOSING.

2.1   Closing. The closing of a sale and purchase of a Note (the "*Closing*") shall be held on the Effective Date and at such other times as the Company and an Investor shall agree (the "*Closing Date*"). A separate Closing shall take place upon each purchase of a Note by an Investor; provided that no closing shall take place after June 1, 2012.

2.2   Delivery. At a Closing (i) an Investor shall deliver to the Company a check or wire transfer in immediately available funds in the amount of such Investor's Loan Amount; (ii) the Company shall issue and deliver to the Investor a Note in favor of such Investor payable

in the principal amount of such Investor's Loan Amount and (iii) the Schedule of Investors shall be amended to reflect the name and amount invested by the Investor and the applicable Closing Date.

3. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE COMPANY.

The Company hereby represents and warrants to each Investor that the following statements are true and correct in all material respects.

3.1 Organization, Good Standing and Qualification. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own its properties and assets and to carry on its business as now conducted and as presently proposed to be conducted.

3.2 Corporate Power. The Company has all requisite corporate power to execute and deliver this Agreement, issue the Note and carry out and perform its obligations under the terms of this Agreement and under the terms of the Note.

3.3 Due Authorization. All action on the part of the Company, its managers and members necessary for the authorization, execution, delivery of, and the performance of all obligations of the Company under this Agreement, and all other agreements executed in connection with this Agreement and the Note have been taken or will be taken prior to the Closing. This Agreement and the Note, when executed and delivered by the Company, shall constitute the valid and legally binding obligations of the Company, enforceable in accordance with their terms, except as may be limited by (a) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights, the relief of debtors, (b) the effect of rules of law governing the availability of equitable remedies and (c) with respect to rights to indemnity, subject to federal and state securities laws.

3.4 Valid Issuance of the Notes. Each Note, when issued in compliance with the provisions of this Agreement, will be validly issued, fully paid and nonassessable and free of any liens or encumbrances.

3.5 Governmental Consents. No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state, or local governmental authority by the Company is required in connection with the consummation of the transactions contemplated by this Agreement, or any agreement contemplated herein except for such qualifications or filings under the Securities Act of 1933 (the "1933 Act") and the regulations thereunder and all other applicable securities laws of the United States as may be required in connection with the transactions contemplated by this Agreement. All such qualifications will be effective on or prior to each Closing and all such filings will be made within the time prescribed by applicable law.

3.6 Compliance with Laws. To its knowledge, the Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or

2

the ownership of its properties, the violation of which would materially and adversely affect the business, assets, liabilities, financial condition, operations or prospects of the Company.

      3.7   <u>Compliance with Other Instruments</u>. To its knowledge, the Company is not in violation or default of any term of its Articles of Organization or Operating Agreement, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a material adverse effect on the Company. The execution, delivery and performance of this Agreement and the Note, and the consummation of the transactions contemplated hereby or thereby will not result in any such violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties. Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder.

      3.8   <u>Litigation</u>. To the Company's knowledge, there is no action, suit, proceeding, claim, arbitration or investigation pending or threatened against the Company, its activities, properties or assets or, to the best of the Company's knowledge, against any manager, officer, or employee of the Company in connection with such manager's officer's, or employee's relationship with, or actions taken on behalf of, the Company.

4. <u>REPRESENTATIONS, WARRANTIES AND CERTAIN AGREEMENTS OF INVESTORS.</u>

      Each Investor, by executing this Agreement, does hereby represent, warrant and/or agree as follows (the use with respect to an Investor of the first person pronouns "I", "me", "mine" or "my" shall refer to an individual, corporation, limited liability company, partnership or other entity-form, as the case may be.)

      4.1   <u>Adequate Disclosure and Review of and Access to Information</u>. I have completed my own independent due diligence investigation of the Company and believe that I am familiar with and fully aware of the Company's business operations, current financial condition and prospects as well as the significant risks associated with its business. Such investigation included an in-depth interview with a senior executive officer of the Company during which we discussed risk and other factors that will influence the Company's operations and business prospects.

      4.2   <u>Purchase for Own Account</u>. I am acquiring the Note with my own funds and for my own account and beneficial interest for investment and not as a nominee or agent and not for the account of any other person. On acceptance of this Agreement by the Company, no person other than I will have any interest, beneficial or otherwise, in the Note. I am not obligated

to transfer to any other person nor do I have any agreement or understanding to do so. I am acquiring the Note for investment and for an indefinite period, not with a view to the sale or distribution of any part or all thereof by public or private sale or other disposition.

      4.3    Speculative Investment; Ability to Assume Financial Risk. I am aware of and understand that a purchase of the Note is a speculative investment which involves a high degree of risk of loss by me of my entire investment. I am able to assume the economic risks as holder of the Note and could absorb a complete loss on such transaction without significantly affecting my financial well-being.

      4.4    No Representations/Forward-Looking Statements. Except as provided herein, I am relying exclusively upon my own due diligence and not on representations or warranties concerning the Company, its products, prospects or financial condition, express or implied.

      4.5    Legends. I am aware and agree that the Note will bear the following legend:

WHISPER CAPITAL GROUP L.L.C., AN DELAWARE LIMITED LIABILITY COMPANY (THE "COMPANY"), IS AN EARLY STAGE COMPANY WITH A LIMITED OPERATING HISTORY. AN INVESTMENT IN THE COMPANY INVOLVES A HIGH DEGREE OF RISK AND IS VERY SPECULATIVE. THERE CAN BE NO ASSURANCE THAT ANY SUCH INVESTMENT IN THE COMPANY CAN OR EVER WILL: (A) BE RECOVERED, (B) RESULT IN ANY PAYMENT TO THE LENDER (AS DEFINED BELOW) OR (C) PROVIDE THE LENDER LIQUIDITY. PARTICIPATING IN THIS INVESTMENT COULD RESULT IN A COMPLETE LOSS OF ANY SUCH INVESTMENT IN THE COMPANY. BY PARTICIPATING IN THIS OFFERING, THE LENDER IS REPRESENTING TO THE COMPANY THAT HE, SHE OR IT IS ABLE TO BEAR THE SUBSTANTIAL ECONOMIC RISKS OF AN INVESTMENT IN THIS NOTE FOR AN INDEFINITE PERIOD OF TIME, HAS NO NEED FOR LIQUIDITY IN SUCH INVESTMENT AND, AT THE PRESENT TIME, COULD AFFORD A COMPLETE LOSS OF SUCH INVESTMENT.

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR UNDER ANY STATE SECURITIES LAWS (COLLECTIVELY WITH THE SECURITIES ACT, THE "ACTS") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT (A) IN ACCORDANCE WITH THE TERMS OF THIS NOTE AND (B) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER THE ACTS OR AN OPINION OF COUNSEL, IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY, THAT AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACTS IS AVAILABLE FOR SUCH OFFER, SALE, TRANSFER, PLEDGE OR HYPOTHECATION.

4.6     Financial Experience. I have sufficient knowledge and experience in business and financial matters to evaluate the risks of an investment in the Note.

4.7     Accredited Investor. I acknowledge and warrant that I am an "accredited investor" (as defined in Rule 501 of Regulation D of the 1933 Act) and have completed the Investor Suitability Questionnaire on Exhibit B.

4.8     Additional Information.   I have had the opportunity, at minimal inconvenience, to ask questions of and obtain from the Company any additional information, to the extent possessed or obtainable without unreasonable effort or expense, necessary to evaluate the merits and risks of an investment in the Note. There is no additional information that I wish to obtain from the Company or from any other source with respect to the Note or the Company and I have concluded, based on information presented to me and my own understanding of investments of this nature, that I wish to purchase the Note.

4.9     No Regulatory Review. I understand that the Note has not been registered under the 1933 Act or the securities laws of any state, and therefore, I must bear the economic risks of the investment for an indefinite period of time since the Note cannot be sold or offered for sale unless it is subsequently so registered or an exemption from such registration is available.

4.10    Non Findings or Due Diligence. I am aware that no federal or state agency has made any finding or determination as to the fairness of the Notes, nor any recommendation or endorsement of the Notes.   I AM AWARE AND UNDERSTAND THAT NO DUE DILIGENCE HAS BEEN PERFORMED BY ANY COUNSEL OR ACCOUNTANT FOR THE COMPANY WITH RESPECT TO THE NOTES.

4.11    Restricted Securities. I have been advised that the Note has not been registered under the 1933 Act, not registered or qualified under any other securities law, on the ground, among others, that the Notes will be issued by the Company in connection with a transaction that does not involve any public offering within the meaning of Section 4(2) of the 1933 Act, under the rules and regulations of the Securities and Exchange Commission thereunder and under comparable exemptive provisions of the securities laws, rules and regulations of other jurisdictions.

4.12    Specific Disclosures. I understand that:

A.  The Company is a newly formed business that has limited operating history and revenues.

B.      The purchase of a Note is a speculative investment which involves a high degree of risk of loss by me of my entire investment.

C.      No audited or reviewed financial statements are being furnished with respect to the Company.

D.    The Company competes in a highly competitive market and in many cases its competitors are better financed and currently have more established market awareness and distribution than the Company.

E.    The Company will be dependent on the availability of its senior executive officers who will be responsible for the overall management of the Company and the development and marketing strategies of its research.

F.    The proceeds from the sale of the Note will fund the Company's operations for only a limited period of time.

4.13    No Solicitation. The offer to purchase the Note was directly communicated to me by the Company and at no time was I presented with or solicited by a leaflet, public promotional meeting, newspaper or magazine article, radio or television advertisement or any other form of general advertising or general solicitation.

4.14    Authorization. This Agreement constitutes my valid and legally binding obligation, enforceable in accordance with its terms except as may be limited by (a) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (b) the effect of the rules of law governing the availability of equitable remedies. I represent that I have full power and authority to enter into and perform this Agreement and all other agreements contemplated herein.

4.15    Investment Experience. I understand that the purchase of a Note involves a substantial risk. I (a) have experience as an investor in securities of companies in the development stage and acknowledge that I am able to fend for myself, can bear the economic risk of an investment in a Note and have such knowledge and experience in financial or business matters that I am capable of evaluating the merits and risks of this investment or (b) have a preexisting personal or business relationship with the Company and certain of its officers, directors or controlling persons of a nature and duration that enables me to be aware of the character, business acumen and financial circumstances of such persons and have had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of a Note.

4.16    Further Limitations on Disposition. Without in any way limiting the representations set forth above, I further agree not to make any disposition of all or any portion of the Note unless and until:

(a)    There is then in effect a registration statement under the 1933 Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(b)    I have notified the Company of the proposed disposition and have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and, if reasonably requested by the Company, I shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will

6

not require registration under the 1933 Act or any applicable state securities laws, provided that no such opinion shall be required for dispositions in compliance with Rule 144 under the 1933 Act, except in extraordinary circumstances; or

(c)     Notwithstanding the provisions of paragraphs (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by me by gift, will or intestate succession to any spouse or lineal descendants or ancestors, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were the Investor hereunder.

4.17    Confidentiality.  I agree that I shall keep confidential and shall not use, disclose or divulge for a period of two years after receipt any information which I may obtain from the Company, pursuant to financial statements, reports and other materials submitted by the Company as required hereunder or under any other documents, unless such information is known, or until such information becomes known, to the public through no fault of mine or my agents, or unless the Company gives written consent to my release of such information, except that no such written consent shall be required (and I shall be free to release such information) if such information is to be provided to my counsel or accountant; provided that any such counsel or accountant shall acknowledge in writing to the Company that he or she is bound by the provisions of this Section 4.17. Notwithstanding the foregoing, this Section 4.17 shall not apply (a) to information which I learn from a third party with the right to make such disclosure, provided I comply with the restrictions imposed by the third party, (b) to information which is in my possession prior to the time of disclosure by the Company and not acquired by me under a confidentiality obligation, (c) to the minimum extent (after requesting and pursuing confidential treatment to the extent reasonably possible) I am required to disclose such information by law or a governmental regulatory authority, and (d) to the minimum extent (after requesting and pursuing confidential treatment to the extent reasonably possible) I am required to disclose such information by court order.

5.  MISCELLANEOUS.

5.1    Survival of Warranties.  The representations, warranties and covenants of the Company and each Investor contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of the Investor, his counsel or the Company, as the case may be.

5.2    Successors and Assigns.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

5.4    Governing Law.  This Agreement shall be governed by and construed under the internal laws of the State of Arizona without giving effect to conflict of laws or principles.

7

5.5 <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

5.6 <u>Headings</u>. The headings and captions used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs, and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto, all of which exhibits are incorporated herein by this reference.

5.7 <u>Notices</u>. Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively given upon personal delivery to the party to be notified, upon receipt when sent by telex, electronic mail (email) or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, or five (5) days after having been sent by registered or certified mail, postage prepaid; or one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Company at 385 Airport Rd. Suite 100, Elgin, Illinois 60123, and to the Investor at the address shown on the Signature Page or at such other address as the parties may designate by giving ten (10) days advance written notice to the other parties hereto.

5.8 <u>Attorneys' Fees</u>. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

5.9 <u>Expenses</u>. Each party will pay its own costs and expenses in connection with the transactions contemplated hereby.

5.10 <u>Amendments and Waivers</u>. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company.

5.11 <u>Severability</u>. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision(s) shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

5.12 <u>Entire Agreement</u>. This Agreement, together with all exhibits and schedules hereto, constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, agreements, understandings duties or obligations between the parties with respect to the subject matter hereof.

5.13   Further Assurances.  From and after the date of this Agreement, upon the request of Investor or the Company, the Company and the Investor shall execute and deliver such instruments, documents or other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement.

5.14   Delays or Omissions.  No delay or omission to exercise any right, power or remedy accruing to Investor, upon any breach or default of the Company under this Agreement, shall impair any such right, power or remedy of Investor nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any holder of any breach or default under this Agreement, or any waiver on the part of Investor of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to Investor, shall be cumulative and not alternative.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

COMPANY

Whisper Capital Group L.L.C.

By: _____

Its: _____

INVESTOR

_____

EXHIBIT B

INVESTOR SUITABILITY QUESTIONNAIRE

(ALL INFORMATION WILL BE TREATED CONFIDENTIALLY)

_____
_____
_____

Dear Sirs,

This information is being furnished to you in connection with my proposed loan to Whisper Capital Group L.L.C. (the "*Company*") of $20,000,000 against the issuance and delivery by the Company of a promissory note for such amount (a "*Note*").

ALL INVESTORS MUST INITIAL THE FOLLOWING LINE:

I, XXXX, understand that the following representations are made for the purpose of determining whether I qualify as an "accredited investor" as that term is defined by the Securities and Exchange Commission for the purpose of inducing the issuance of the Note to me. If I do not initial any of the statements below, I will not be considered an accredited investor, and the Company will determine, in its sole discretion, if I am otherwise eligible. I hereby represent that any statements initialed below are true, accurate and complete in all respects. I understand that a misrepresentation may constitute a violation of law, and that any person who suffers damage as a result of a false representation may have a claim against me for damages.

In accordance with the foregoing, the following representations and data are hereby given (**please initial where indicated and complete the information on both pages of this Questionnaire**):

I.      Accredited Investor Representation

A.      I certify that I am an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended (the "*Act*") because (select one or more of the following):

_____ I have a net worth (or joining net worth with my spouse) in excess of $_____.

_____ I have had individual income in excess of $_____ in each of the two most recent years (or joint income with my spouse in excess of $_____ in each

11

of those years) and have a reasonable expectation of reaching the same income level in the current year.

_____ I am an entity (LLC, partnership, corporation, or other business organization) in which all of the equity owners are accredited.

_____ I am a trust with total assets in excess of $_____, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as defined in Rule 506(b) of Regulation D of the Act.

_____ I am a director or executive officer of the Company.

_____ I am an organization described in Section 501(c)(3) of the Internal Revenue Code, a Company, a Massachusetts or similar business trust, or a partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $_____.

_____ I meet one of the other definitions of an "accredited investor" set forth in Rule 501(a). Please identify: _____

B. <u>Please initial one</u> of the following statement:

_____ I have such knowledge in financial and business matters as to be capable of evaluating the relative merits and risks of an investment in the Note, and am not utilizing a purchaser representative in connection with evaluating such merits and risk. The information contained in this Questionnaire is offered as evidence of such knowledge and experience.

_____ I do NOT have such knowledge in financial and business matters as to be capable of evaluating the relative merits and risks of an investment in the Note.

C. <u>Please initial</u> next to each of the following statements:

_____ I am willing and able to bear the economic risk of an investment in the Note during the expected life of the Company. In making this statement, consideration has been given to whether I could afford the risks of loss inherent in investment in securities. I offer the information below in this Questionnaire as evidence of my ability to bear the economic risk.

_____ A Note will be solely for my own account and not for the account of any other person or with a view to any resale or distributions thereof.

_____ My commitment to illiquid investments in relation to my net worth and the acquisition of the Note (which are illiquid) will not cause my overall commitment to illiquid securities to be excessive.

12

_____ My financial resources are such that I can pay (without consideration of the amounts invested in the Note) any taxes due on my allocable share of gains and income from the Note.

_____ I represent that (a) the information herein is complete and accurate and may be relied upon by you, and (b) that I will notify you of any material change in any of such information occurring prior to acceptance of my subscription.

In Witness Whereof, I have executed this Purchaser Suitability Questionnaire this _____ day of _____, 200__, and declare under oath that it is truthful and correct.

_____
Signature of Purchaser

_____NG___HEI_____
Name of Purchaser

13

# NOTE PURCHASE AGREEMENT

THIS NOTE PURCHASE AGREEMENT (the "*Agreement*") is made effective as of May 1 2011(the "*Effective Date*") by and among Whisper Capital Group L.L.C., an Delaware limited liability company (the "Company"), and the persons named on the Schedule of Investors attached hereto (individually an "*Investor*" and collectively, the "*Investors*").

## RECITAL

WHEREAS, in order to provide the Company with capital needed to conduct its business, the Company desires to borrow and the Investors are willing to loan to the Company up to an aggregate principal amount of Twenty Million Dollars ($20,000,000) (the "*Maximum Loan Amount*") on the terms set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises, representations, warranties, and covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. AMOUNT AND TERMS OF THE LOAN

   Subject to the terms of this Agreement, each Investor agrees to loan to the Company at the Closing (as hereinafter defined) the amount set forth beneath such Investor's name on the Signature Page (each a "*Loan Amount*" and collectively the "*Loan*") against the issuance and delivery by the Company of a promissory note for such amount, in substantially the form attached hereto as Exhibit A (each a "*Note*" and collectively the "*Notes*"). The Loan shall not exceed the Maximum Loan Amount, in the aggregate.

   THE PARTIES ACKNOWLEDGE THAT THE COMPANY IS CURRENTLY ORGANIZED AS A LIMITED LIABILITY COMPANY AND THAT IT MAY CONVERT TO A "C-CORPORATION" IN THE FUTURE. In such event, the Notes shall be assumed by and become the obligation of the C-Corporation.

2. THE CLOSING; DELIVERIES AT CLOSING.

   2.1    Closing. The closing of a sale and purchase of a Note (the "*Closing*") shall be held on the Effective Date and at such other times as the Company and an Investor shall agree (the "*Closing Date*"). A separate Closing shall take place upon each purchase of a Note by an Investor; provided that no closing shall take place after June 1, 2012.

   2.2    Delivery. At a Closing (i) an Investor shall deliver to the Company a check or wire transfer in immediately available funds in the amount of such Investor's Loan Amount; (ii) the Company shall issue and deliver to the Investor a Note in favor of such Investor payable

in the principal amount of such Investor's Loan Amount and (iii) the Schedule of Investors shall be amended to reflect the name and amount invested by the Investor and the applicable Closing Date.

3. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE COMPANY.

The Company hereby represents and warrants to each Investor that the following statements are true and correct in all material respects.

3.1     Organization, Good Standing and Qualification. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own its properties and assets and to carry on its business as now conducted and as presently proposed to be conducted.

3.2     Corporate Power. The Company has all requisite corporate power to execute and deliver this Agreement, issue the Note and carry out and perform its obligations under the terms of this Agreement and under the terms of the Note.

3.3     Due Authorization. All action on the part of the Company, its managers and members necessary for the authorization, execution, delivery of, and the performance of all obligations of the Company under this Agreement, and all other agreements executed in connection with this Agreement and the Note have been taken or will be taken prior to the Closing. This Agreement and the Note, when executed and delivered by the Company, shall constitute the valid and legally binding obligations of the Company, enforceable in accordance with their terms, except as may be limited by (a) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights, the relief of debtors, (b) the effect of rules of law governing the availability of equitable remedies and (c) with respect to rights to indemnity, subject to federal and state securities laws.

3.4     Valid Issuance of the Notes. Each Note, when issued in compliance with the provisions of this Agreement, will be validly issued, fully paid and nonassessable and free of any liens or encumbrances.

3.5     Governmental Consents. No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state, or local governmental authority by the Company is required in connection with the consummation of the transactions contemplated by this Agreement, or any agreement contemplated herein except for such qualifications or filings under the Securities Act of 1933 (the "1933 Act") and the regulations thereunder and all other applicable securities laws of the United States as may be required in connection with the transactions contemplated by this Agreement. All such qualifications will be effective on or prior to each Closing and all such filings will be made within the time prescribed by applicable law.

3.6     Compliance with Laws. To its knowledge, the Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or

2

the ownership of its properties, the violation of which would materially and adversely affect the business, assets, liabilities, financial condition, operations or prospects of the Company.

3.7 Compliance with Other Instruments. To its knowledge, the Company is not in violation or default of any term of its Articles of Organization or Operating Agreement, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a material adverse effect on the Company. The execution, delivery and performance of this Agreement and the Note, and the consummation of the transactions contemplated hereby or thereby will not result in any such violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties. Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder.

3.8 Litigation. To the Company's knowledge, there is no action, suit, proceeding, claim, arbitration or investigation pending or threatened against the Company, its activities, properties or assets or, to the best of the Company's knowledge, against any manager, officer, or employee of the Company in connection with such manager's officer's, or employee's relationship with, or actions taken on behalf of, the Company.

4. REPRESENTATIONS, WARRANTIES AND CERTAIN AGREEMENTS OF INVESTORS.

Each Investor, by executing this Agreement, does hereby represent, warrant and/or agree as follows (the use with respect to an Investor of the first person pronouns "I", "me", "mine" or "my" shall refer to an individual, corporation, limited liability company, partnership or other entity-form, as the case may be.)

4.1 Adequate Disclosure and Review of and Access to Information. I have completed my own independent due diligence investigation of the Company and believe that I am familiar with and fully aware of the Company's business operations, current financial condition and prospects as well as the significant risks associated with its business. Such investigation included an in-depth interview with a senior executive officer of the Company during which we discussed risk and other factors that will influence the Company's operations and business prospects.

4.2 Purchase for Own Account. I am acquiring the Note with my own funds and for my own account and beneficial interest for investment and not as a nominee or agent and not for the account of any other person. On acceptance of this Agreement by the Company, no person other than I will have any interest, beneficial or otherwise, in the Note. I am not obligated

3

to transfer to any other person nor do I have any agreement or understanding to do so. I am acquiring the Note for investment and for an indefinite period, not with a view to the sale or distribution of any part or all thereof by public or private sale or other disposition.

        4.3    <u>Speculative Investment, Ability to Assume Financial Risk</u>. I am aware of and understand that a purchase of the Note is a speculative investment which involves a high degree of risk of loss by me of my entire investment. I am able to assume the economic risks as holder of the Note and could absorb a complete loss on such transaction without significantly affecting my financial well-being.

        4.4    <u>No Representations/Forward-Looking Statements</u>. Except as provided herein, I am relying exclusively upon my own due diligence and not on representations or warranties concerning the Company, its products, prospects or financial condition, express or implied.

        4.5    <u>Legends</u>. I am aware and agree that the Note will bear the following legend:

WHISPER CAPITAL GROUP L.L.C., AN DELAWARE LIMITED LIABILITY COMPANY (THE "COMPANY"), IS AN EARLY STAGE COMPANY WITH A LIMITED OPERATING HISTORY. AN INVESTMENT IN THE COMPANY INVOLVES A HIGH DEGREE OF RISK AND IS VERY SPECULATIVE. THERE CAN BE NO ASSURANCE THAT ANY SUCH INVESTMENT IN THE COMPANY CAN OR EVER WILL: (A) BE RECOVERED, (B) RESULT IN ANY PAYMENT TO THE LENDER (AS DEFINED BELOW) OR (C) PROVIDE THE LENDER LIQUIDITY.  PARTICIPATING IN THIS INVESTMENT COULD RESULT IN A COMPLETE LOSS OF ANY SUCH INVESTMENT IN THE COMPANY.  BY PARTICIPATING IN THIS OFFERING, THE LENDER IS REPRESENTING TO THE COMPANY THAT HE, SHE OR IT IS ABLE TO BEAR THE SUBSTANTIAL ECONOMIC RISKS OF AN INVESTMENT IN THIS NOTE FOR AN INDEFINITE PERIOD OF TIME, HAS NO NEED FOR LIQUIDITY IN SUCH INVESTMENT AND, AT THE PRESENT TIME, COULD AFFORD A COMPLETE LOSS OF SUCH INVESTMENT.

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR UNDER ANY STATE SECURITIES LAWS (COLLECTIVELY WITH THE SECURITIES ACT, THE "ACTS") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT (A) IN ACCORDANCE WITH THE TERMS OF THIS NOTE AND (B) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER THE ACTS OR AN OPINION OF COUNSEL, IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY, THAT AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACTS IS AVAILABLE FOR SUCH OFFER, SALE, TRANSFER, PLEDGE OR HYPOTHECATION.

4.6 <u>Financial Experience</u>. I have sufficient knowledge and experience in business and financial matters to evaluate the risks of an investment in the Note.

4.7 <u>Accredited Investor</u>. I acknowledge and warrant that I am an "accredited investor" (as defined in Rule 501 of Regulation D of the 1933 Act) and have completed the Investor Suitability Questionnaire on <u>Exhibit B</u>.

4.8 <u>Additional Information</u>. I have had the opportunity, at minimal inconvenience, to ask questions of and obtain from the Company any additional information, to the extent possessed or obtainable without unreasonable effort or expense, necessary to evaluate the merits and risks of an investment in the Note. There is no additional information that I wish to obtain from the Company or from any other source with respect to the Note or the Company and I have concluded, based on information presented to me and my own understanding of investments of this nature, that I wish to purchase the Note.

4.9 <u>No Regulatory Review</u>. I understand that the Note has not been registered under the 1933 Act or the securities laws of any state, and therefore, I must bear the economic risks of the investment for an indefinite period of time since the Note cannot be sold or offered for sale unless it is subsequently so registered or an exemption from such registration is available.

4.10 <u>Non Findings or Due Diligence</u>. I am aware that no federal or state agency has made any finding or determination as to the fairness of the Notes, nor any recommendation or endorsement of the Notes. I AM AWARE AND UNDERSTAND THAT NO DUE DILIGENCE HAS BEEN PERFORMED BY ANY COUNSEL OR ACCOUNTANT FOR THE COMPANY WITH RESPECT TO THE NOTES.

4.11 <u>Restricted Securities</u>. I have been advised that the Note has not been registered under the 1933 Act, not registered or qualified under any other securities law, on the ground, among others, that the Notes will be issued by the Company in connection with a transaction that does not involve any public offering within the meaning of Section 4(2) of the 1933 Act, under the rules and regulations of the Securities and Exchange Commission thereunder and under comparable exemptive provisions of the securities laws, rules and regulations of other jurisdictions.

4.12 <u>Specific Disclosures</u>. I understand that:

A. The Company is a newly formed business that has limited operating history and revenues.

B. The purchase of a Note is a speculative investment which involves a high degree of risk of loss by me of my entire investment.

C. No audited or reviewed financial statements are being furnished with respect to the Company.

5

D.    The Company competes in a highly competitive market and in many cases its competitors are better financed and currently have more established market awareness and distribution than the Company.

E.    The Company will be dependent on the availability of its senior executive officers who will be responsible for the overall management of the Company and the development and marketing strategies of its research.

F.    The proceeds from the sale of the Note will fund the Company's operations for only a limited period of time.

4.13    No Solicitation. The offer to purchase the Note was directly communicated to me by the Company and at no time was I presented with or solicited by a leaflet, public promotional meeting, newspaper or magazine article, radio or television advertisement or any other form of general advertising or general solicitation.

4.14    Authorization. This Agreement constitutes my valid and legally binding obligation, enforceable in accordance with its terms except as may be limited by (a) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (b) the effect of the rules of law governing the availability of equitable remedies. I represent that I have full power and authority to enter into and perform this Agreement and all other agreements contemplated herein.

4.15    Investment Experience. I understand that the purchase of a Note involves a substantial risk. I (a) have experience as an investor in securities of companies in the development stage and acknowledge that I am able to fend for myself, can bear the economic risk of an investment in a Note and have such knowledge and experience in financial or business matters that I am capable of evaluating the merits and risks of this investment or (b) have a preexisting personal or business relationship with the Company and certain of its officers, directors or controlling persons of a nature and duration that enables me to be aware of the character, business acumen and financial circumstances of such persons and have had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of a Note.

4.16    Further Limitations on Disposition. Without in any way limiting the representations set forth above, I further agree not to make any disposition of all or any portion of the Note unless and until:

(a)    There is then in effect a registration statement under the 1933 Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(b)    I have notified the Company of the proposed disposition and have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and, if reasonably requested by the Company, I shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will

6

not require registration under the 1933 Act or any applicable state securities laws, provided that no such opinion shall be required for dispositions in compliance with Rule 144 under the 1933 Act, except in extraordinary circumstances; or

(c) Notwithstanding the provisions of paragraphs (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by me by gift, will or intestate succession to any spouse or lineal descendants or ancestors, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were the Investor hereunder.

4.17    Confidentiality.  I agree that I shall keep confidential and shall not use, disclose or divulge for a period of two years after receipt any information which I may obtain from the Company, pursuant to financial statements, reports and other materials submitted by the Company as required hereunder or under any other documents, unless such information is known, or until such information becomes known, to the public through no fault of mine or my agents, or unless the Company gives written consent to my release of such information, except that no such written consent shall be required (and I shall be free to release such information) if such information is to be provided to my counsel or accountant; provided that any such counsel or accountant shall acknowledge in writing to the Company that he or she is bound by the provisions of this Section 4.17. Notwithstanding the foregoing, this Section 4.17 shall not apply (a) to information which I learn from a third party with the right to make such disclosure, provided I comply with the restrictions imposed by the third party, (b) to information which is in my possession prior to the time of disclosure by the Company and not acquired by me under a confidentiality obligation, (c) to the minimum extent (after requesting and pursuing confidential treatment to the extent reasonably possible) I am required to disclose such information by law or a governmental regulatory authority, and (d) to the minimum extent (after requesting and pursuing confidential treatment to the extent reasonably possible) I am required to disclose such information by court order.

5.  MISCELLANEOUS.

5.1    Survival of Warranties.  The representations, warranties and covenants of the Company and each Investor contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of the Investor, his counsel or the Company, as the case may be.

5.2    Successors and Assigns.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

5.4    Governing Law.  This Agreement shall be governed by and construed under the internal laws of the State of Arizona without giving effect to conflict of laws or principles.

5.5    Counterparts.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

5.6    Headings.    The headings and captions used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs, and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto, all of which exhibits are incorporated herein by this reference.

5.7    Notices.    Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively given upon personal delivery to the party to be notified, upon receipt when sent by telex, electronic mail (email) or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, or  five (5) days after having been sent by registered or certified mail, postage prepaid; or one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Company at 385 Airport Rd. Suite 100, Elgin, Illinois 60123, and to the Investor at the address shown on the Signature Page or at such other address as the parties may designate by giving ten (10) days advance written notice to the other parties hereto.

5.8    Attorneys' Fees.    If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

5.9    Expenses.    Each party will pay its own costs and expenses in connection with the transactions contemplated hereby.

5.10    Amendments and Waivers.    Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company.

5.11    Severability.    If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision(s) shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

5.12    Entire Agreement.    This Agreement, together with all exhibits and schedules hereto, constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, agreements, understandings duties or obligations between the parties with respect to the subject matter hereof.

5.13    Further Assurances.  From and after the date of this Agreement, upon the request of Investor or the Company, the Company and the Investor shall execute and deliver such instruments, documents or other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement.

5.14    Delays or Omissions.  No delay or omission to exercise any right, power or remedy accruing to Investor, upon any breach or default of the Company under this Agreement, shall impair any such right, power or remedy of Investor nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any holder of any breach or default under this Agreement, or any waiver on the part of Investor of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to Investor, shall be cumulative and not alternative.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

COMPANY

Whisper Capital Group L.L.C.

By: _____

Its: _____

INVESTOR

_____

11479896.2

EXHIBIT B

INVESTOR SUITABILITY QUESTIONNAIRE

(ALL INFORMATION WILL BE TREATED CONFIDENTIALLY)

_____
_____
_____

Dear Sirs,

This information is being furnished to you in connection with my proposed loan to Whisper Capital Group L.L.C. (the "*Company*") of $20,000,000 against the issuance and delivery by the Company of a promissory note for such amount (a "*Note*").

**ALL INVESTORS MUST INITIAL THE FOLLOWING LINE:**

I, XXXX, understand that the following representations are made for the purpose of determining whether I qualify as an "accredited investor" as that term is defined by the Securities and Exchange Commission for the purpose of inducing the issuance of the Note to me. If I do not initial any of the statements below, I will not be considered an accredited investor, and the Company will determine, in its sole discretion, if I am otherwise eligible. I hereby represent that any statements initialed below are true, accurate and complete in all respects. I understand that a misrepresentation may constitute a violation of law, and that any person who suffers damage as a result of a false representation may have a claim against me for damages.

In accordance with the foregoing, the following representations and data are hereby given (**please initial where indicated and complete the information on both pages of this Questionnaire**):

I.    Accredited Investor Representation

A. I certify that I am an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended (the "*Act*") because (select one or more of the following):

_____ I have a net worth (or joining net worth with my spouse) in excess of $_____.

_____ I have had individual income in excess of $_____ in each of the two most recent years (or joint income with my spouse in excess of $_____ in each

11

of those years) and have a reasonable expectation of reaching the same income level in the current year.

_____ I am an entity (LLC, partnership, corporation, or other business organization) in which all of the equity owners are accredited.

_____ I am a trust with total assets in excess of $_____, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as defined in Rule 506(b) of Regulation D of the Act.

_____ I am a director or executive officer of the Company.
_____ I am an organization described in Section 501(c)(3) of the Internal Revenue Code, a Company, a Massachusetts or similar business trust, or a partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $_____.

___X___ I meet one of the other definitions of an "accredited investor" set forth in Rule 501(a). Please identify:
_____.

B. Please initial one of the following statement:

___X___ I have such knowledge in financial and business matters as to be capable of evaluating the relative merits and risks of an investment in the Note, and am not utilizing a purchaser representative in connection with evaluating such merits and risk. The information contained in this Questionnaire is offered as evidence of such knowledge and experience.

_____ I do NOT have such knowledge in financial and business matters as to be capable of evaluating the relative merits and risks of an investment in the Note.

C. Please initial next to each of the following statements:

___X___ I am willing and able to bear the economic risk of an investment in the Note during the expected life of the Company. In making this statement, consideration has been given to whether I could afford the risks of loss inherent in investment in securities. I offer the information below in this Questionnaire as evidence of my ability to bear the economic risk.

___X___ A Note will be solely for my own account and not for the account of any other person or with a view to any resale or distributions thereof.

___X___ My commitment to illiquid investments in relation to my net worth and the acquisition of the Note (which are illiquid) will not cause my overall commitment to illiquid securities to be excessive.

12

_____X___ My financial resources are such that I can pay (without consideration of the amounts invested in the Note) any taxes due on my allocable share of gains and income from the Note.

_____X___ I represent that (a) the information herein is complete and accurate and may be relied upon by you, and (b) that I will notify you of any material change in any of such information occurring prior to acceptance of my subscription.

In Witness Whereof, I have executed this Purchaser Suitability Questionnaire this _____ day of _____, 200__, and declare under oath that it is truthful and correct.


_____
Signature of Purchaser

CHAN  LIT  SENG
_____
Name of Purchaser

13

# NOTE PURCHASE AGREEMENT

THIS NOTE PURCHASE AGREEMENT (the "*Agreement*") is made effective as of May 1 2011(the "*Effective Date*") by and among Whisper Capital Group L.L.C., an Delaware limited liability company (the "Company"), and the persons named on the Schedule of Investors attached hereto (individually an "*Investor*" and collectively, the "*Investors*").

## RECITAL

WHEREAS, in order to provide the Company with capital needed to conduct its business, the Company desires to borrow and the Investors are willing to loan to the Company up to an aggregate principal amount of Twenty Million Dollars ($20,000,000) (the "*Maximum Loan Amount*") on the terms set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises, representations, warranties, and covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. AMOUNT AND TERMS OF THE LOAN

Subject to the terms of this Agreement, each Investor agrees to loan to the Company at the Closing (as hereinafter defined) the amount set forth beneath such Investor's name on the Signature Page (each a "*Loan Amount*" and collectively the "*Loan*") against the issuance and delivery by the Company of a promissory note for such amount, in substantially the form attached hereto as <u>Exhibit A</u> (each a "*Note*" and collectively the "*Notes*"). The Loan shall not exceed the Maximum Loan Amount, in the aggregate.

**THE PARTIES ACKNOWLEDGE THAT THE COMPANY IS CURRENTLY ORGANIZED AS A LIMITED LIABILITY COMPANY AND THAT IT MAY CONVERT TO A "C-CORPORATION" IN THE FUTURE.** In such event, the Notes shall be assumed by and become the obligation of the C-Corporation.

2. THE CLOSING; DELIVERIES AT CLOSING.

2.1    <u>Closing</u>. The closing of a sale and purchase of a Note (the "*Closing*") shall be held on the Effective Date and at such other times as the Company and an Investor shall agree (the "*Closing Date*"). A separate Closing shall take place upon each purchase of a Note by an Investor; provided that no closing shall take place after June 1, 2012.

2.2    <u>Delivery</u>. At a Closing (i) an Investor shall deliver to the Company a check or wire transfer in immediately available funds in the amount of such Investor's Loan Amount; (ii) the Company shall issue and deliver to the Investor a Note in favor of such Investor payable

114798962

in the principal amount of such Investor's Loan Amount and (iii) the Schedule of Investors shall be amended to reflect the name and amount invested by the Investor and the applicable Closing Date.

3.  REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE COMPANY.

The Company hereby represents and warrants to each Investor that the following statements are true and correct in all material respects.

3.1     Organization, Good Standing and Qualification. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own its properties and assets and to carry on its business as now conducted and as presently proposed to be conducted.

3.2     Corporate Power. The Company has all requisite corporate power to execute and deliver this Agreement, issue the Note and carry out and perform its obligations under the terms of this Agreement and under the terms of the Note.

3.3     Due Authorization. All action on the part of the Company, its managers and members necessary for the authorization, execution, delivery of, and the performance of all obligations of the Company under this Agreement, and all other agreements executed in connection with this Agreement and the Note have been taken or will be taken prior to the Closing. This Agreement and the Note, when executed and delivered by the Company, shall constitute the valid and legally binding obligations of the Company, enforceable in accordance with their terms, except as may be limited by (a) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights, the relief of debtors, (b) the effect of rules of law governing the availability of equitable remedies and (c) with respect to rights to indemnity, subject to federal and state securities laws.

3.4     Valid Issuance of the Notes. Each Note, when issued in compliance with the provisions of this Agreement, will be validly issued, fully paid and nonassessable and free of any liens or encumbrances.

3.5     Governmental Consents. No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state, or local governmental authority by the Company is required in connection with the consummation of the transactions contemplated by this Agreement, or any agreement contemplated herein except for such qualifications or filings under the Securities Act of 1933 (the "1933 Act") and the regulations thereunder and all other applicable securities laws of the United States as may be required in connection with the transactions contemplated by this Agreement. All such qualifications will be effective on or prior to each Closing and all such filings will be made within the time prescribed by applicable law.

3.6     Compliance with Laws. To its knowledge, the Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or

2

the ownership of its properties, the violation of which would materially and adversely affect the business, assets, liabilities, financial condition, operations or prospects of the Company.

3.7 <u>Compliance with Other Instruments</u>. To its knowledge, the Company is not in violation or default of any term of its Articles of Organization or Operating Agreement, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a material adverse effect on the Company. The execution, delivery and performance of this Agreement and the Note, and the consummation of the transactions contemplated hereby or thereby will not result in any such violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties. Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder.

3.8 <u>Litigation</u>. To the Company's knowledge, there is no action, suit, proceeding, claim, arbitration or investigation pending or threatened against the Company, its activities, properties or assets or, to the best of the Company's knowledge, against any manager, officer, or employee of the Company in connection with such manager's officer's, or employee's relationship with, or actions taken on behalf of, the Company.

4. <u>REPRESENTATIONS, WARRANTIES AND CERTAIN AGREEMENTS OF INVESTORS</u>.

Each Investor, by executing this Agreement, does hereby represent, warrant and/or agree as follows (the use with respect to an Investor of the first person pronouns "I", "me", "mine" or "my" shall refer to an individual, corporation, limited liability company, partnership or other entity-form, as the case may be.)

4.1 <u>Adequate Disclosure and Review of and Access to Information</u>. I have completed my own independent due diligence investigation of the Company and believe that I am familiar with and fully aware of the Company's business operations, current financial condition and prospects as well as the significant risks associated with its business. Such investigation included an in-depth interview with a senior executive officer of the Company during which we discussed risk and other factors that will influence the Company's operations and business prospects.

4.2 <u>Purchase for Own Account</u>. I am acquiring the Note with my own funds and for my own account and beneficial interest for investment and not as a nominee or agent and not for the account of any other person. On acceptance of this Agreement by the Company, no person other than I will have any interest, beneficial or otherwise, in the Note. I am not obligated

3

to transfer to any other person nor do I have any agreement or understanding to do so. I am acquiring the Note for investment and for an indefinite period, not with a view to the sale or distribution of any part or all thereof by public or private sale or other disposition.

      4.3    Speculative Investment, Ability to Assume Financial Risk. I am aware of and understand that a purchase of the Note is a speculative investment which involves a high degree of risk of loss by me of my entire investment. I am able to assume the economic risks as holder of the Note and could absorb a complete loss on such transaction without significantly affecting my financial well-being.

      4.4    No Representations/Forward-Looking Statements. Except as provided herein, I am relying exclusively upon my own due diligence and not on representations or warranties concerning the Company, its products, prospects or financial condition, express or implied.

      4.5    Legends. I am aware and agree that the Note will bear the following legend:

> WHISPER CAPITAL GROUP L.L.C., AN DELAWARE LIMITED LIABILITY COMPANY (THE "COMPANY"), IS AN EARLY STAGE COMPANY WITH A LIMITED OPERATING HISTORY. AN INVESTMENT IN THE COMPANY INVOLVES A HIGH DEGREE OF RISK AND IS VERY SPECULATIVE. THERE CAN BE NO ASSURANCE THAT ANY SUCH INVESTMENT IN THE COMPANY CAN OR EVER WILL: (A) BE RECOVERED, (B) RESULT IN ANY PAYMENT TO THE LENDER (AS DEFINED BELOW) OR (C) PROVIDE THE LENDER LIQUIDITY. PARTICIPATING IN THIS INVESTMENT COULD RESULT IN A COMPLETE LOSS OF ANY SUCH INVESTMENT IN THE COMPANY. BY PARTICIPATING IN THIS OFFERING, THE LENDER IS REPRESENTING TO THE COMPANY THAT HE, SHE OR IT IS ABLE TO BEAR THE SUBSTANTIAL ECONOMIC RISKS OF AN INVESTMENT IN THIS NOTE FOR AN INDEFINITE PERIOD OF TIME, HAS NO NEED FOR LIQUIDITY IN SUCH INVESTMENT AND, AT THE PRESENT TIME, COULD AFFORD A COMPLETE LOSS OF SUCH INVESTMENT.

> THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR UNDER ANY STATE SECURITIES LAWS (COLLECTIVELY WITH THE SECURITIES ACT, THE "ACTS") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT (A) IN ACCORDANCE WITH THE TERMS OF THIS NOTE AND (B) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER THE ACTS OR AN OPINION OF COUNSEL, IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY, THAT AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACTS IS AVAILABLE FOR SUCH OFFER, SALE, TRANSFER, PLEDGE OR HYPOTHECATION.

4

4.6     Financial Experience. I have sufficient knowledge and experience in business and financial matters to evaluate the risks of an investment in the Note.

4.7     Accredited Investor. I acknowledge and warrant that I am an "accredited investor" (as defined in Rule 501 of Regulation D of the 1933 Act) and have completed the Investor Suitability Questionnaire on Exhibit B.

4.8     Additional Information.    I have had the opportunity, at minimal inconvenience, to ask questions of and obtain from the Company any additional information, to the extent possessed or obtainable without unreasonable effort or expense, necessary to evaluate the merits and risks of an investment in the Note. There is no additional information that I wish to obtain from the Company or from any other source with respect to the Note or the Company and I have concluded, based on information presented to me and my own understanding of investments of this nature, that I wish to purchase the Note.

4.9     No Regulatory Review. I understand that the Note has not been registered under the 1933 Act or the securities laws of any state, and therefore, I must bear the economic risks of the investment for an indefinite period of time since the Note cannot be sold or offered for sale unless it is subsequently so registered or an exemption from such registration is available.

4.10     Non Findings or Due Diligence. I am aware that no federal or state agency has made any finding or determination as to the fairness of the Notes, nor any recommendation or endorsement of the Notes.    I AM AWARE AND UNDERSTAND THAT NO DUE DILIGENCE HAS BEEN PERFORMED BY ANY COUNSEL OR ACCOUNTANT FOR THE COMPANY WITH RESPECT TO THE NOTES.

4.11     Restricted Securities. I have been advised that the Note has not been registered under the 1933 Act, not registered or qualified under any other securities law, on the ground, among others, that the Notes will be issued by the Company in connection with a transaction that does not involve any public offering within the meaning of Section 4(2) of the 1933 Act, under the rules and regulations of the Securities and Exchange Commission thereunder and under comparable exemptive provisions of the securities laws, rules and regulations of other jurisdictions.

4.12     Specific Disclosures. I understand that:

A.  The Company is a newly formed business that has limited operating history and revenues.

B.     The purchase of a Note is a speculative investment which involves a high degree of risk of loss by me of my entire investment.

C.     No audited or reviewed financial statements are being furnished with respect to the Company.

D.    The Company competes in a highly competitive market and in many cases its competitors are better financed and currently have more established market awareness and distribution than the Company.

E.    The Company will be dependent on the availability of its senior executive officers who will be responsible for the overall management of the Company and the development and marketing strategies of its research.

F.    The proceeds from the sale of the Note will fund the Company's operations for only a limited period of time.

4.13    No Solicitation. The offer to purchase the Note was directly communicated to me by the Company and at no time was I presented with or solicited by a leaflet, public promotional meeting, newspaper or magazine article, radio or television advertisement or any other form of general advertising or general solicitation.

4.14    Authorization. This Agreement constitutes my valid and legally binding obligation, enforceable in accordance with its terms except as may be limited by (a) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (b) the effect of the rules of law governing the availability of equitable remedies. I represent that I have full power and authority to enter into and perform this Agreement and all other agreements contemplated herein.

4.15    Investment Experience. I understand that the purchase of a Note involves a substantial risk. I (a) have experience as an investor in securities of companies in the development stage and acknowledge that I am able to fend for myself, can bear the economic risk of an investment in a Note and have such knowledge and experience in financial or business matters that I am capable of evaluating the merits and risks of this investment or (b) have a preexisting personal or business relationship with the Company and certain of its officers, directors or controlling persons of a nature and duration that enables me to be aware of the character, business acumen and financial circumstances of such persons and have had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of a Note.

4.16    Further Limitations on Disposition.  Without in any way limiting the representations set forth above, I further agree not to make any disposition of all or any portion of the Note unless and until:

(a)    There is then in effect a registration statement under the 1933 Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(b)    I have notified the Company of the proposed disposition and have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and, if reasonably requested by the Company, I shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will

not require registration under the 1933 Act or any applicable state securities laws, provided that no such opinion shall be required for dispositions in compliance with Rule 144 under the 1933 Act, except in extraordinary circumstances; or

(c)     Notwithstanding the provisions of paragraphs (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by me by gift, will or intestate succession to any spouse or lineal descendants or ancestors, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were the Investor hereunder.

4.17     Confidentiality.  I agree that I shall keep confidential and shall not use, disclose or divulge for a period of two years after receipt any information which I may obtain from the Company, pursuant to financial statements, reports and other materials submitted by the Company as required hereunder or under any other documents, unless such information is known, or until such information becomes known, to the public through no fault of mine or my agents, or unless the Company gives written consent to my release of such information, except that no such written consent shall be required (and I shall be free to release such information) if such information is to be provided to my counsel or accountant; provided that any such counsel or accountant shall acknowledge in writing to the Company that he or she is bound by the provisions of this Section 4.17.  Notwithstanding the foregoing, this Section 4.17 shall not apply (a) to information which I learn from a third party with the right to make such disclosure, provided I comply with the restrictions imposed by the third party, (b) to information which is in my possession prior to the time of disclosure by the Company and not acquired by me under a confidentiality obligation, (c) to the minimum extent (after requesting and pursuing confidential treatment to the extent reasonably possible) I am required to disclose such information by law or a governmental regulatory authority, and (d) to the minimum extent (after requesting and pursuing confidential treatment to the extent reasonably possible) I am required to disclose such information by court order.

5.  MISCELLANEOUS.

5.1     Survival of Warranties.  The representations, warranties and covenants of the Company and each Investor contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of the Investor, his counsel or the Company, as the case may be.

5.2     Successors and Assigns.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

5.4     Governing Law.  This Agreement shall be governed by and construed under the internal laws of the State of Arizona without giving effect to conflict of laws or principles.

7

5.5    Counterparts.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

5.6    Headings.    The headings and captions used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs, and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto, all of which exhibits are incorporated herein by this reference.

5.7    Notices.    Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively given upon personal delivery to the party to be notified, upon receipt when sent by telex, electronic mail (email) or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, or  five (5) days after having been sent by registered or certified mail, postage prepaid; or one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Company at 385 Airport Rd. Suite 100, Elgin, Illinois 60123, and to the Investor at the address shown on the Signature Page or at such other address as the parties may designate by giving ten (10) days advance written notice to the other parties hereto.

5.8    Attorneys' Fees.    If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

5.9    Expenses.    Each party will pay its own costs and expenses in connection with the transactions contemplated hereby.

5.10    Amendments and Waivers.    Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company.

5.11    Severability.    If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision(s) shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

5.12    Entire Agreement.    This Agreement, together with all exhibits and schedules hereto, constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, agreements, understandings duties or obligations between the parties with respect to the subject matter hereof.

8

5.13 <u>Further Assurances</u>. From and after the date of this Agreement, upon the request of Investor or the Company, the Company and the Investor shall execute and deliver such instruments, documents or other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement.

5.14 <u>Delays or Omissions</u>. No delay or omission to exercise any right, power or remedy accruing to Investor, upon any breach or default of the Company under this Agreement, shall impair any such right, power or remedy of Investor nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any holder of any breach or default under this Agreement, or any waiver on the part of Investor of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to Investor, shall be cumulative and not alternative.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

COMPANY

Whisper Capital Group L.L.C.

By: _____

Its: _____

INVESTOR

_____

J1479896.2

## EXHIBIT B

## INVESTOR SUITABILITY QUESTIONNAIRE

## (ALL INFORMATION WILL BE TREATED CONFIDENTIALLY)

Dear Sirs,

This information is being furnished to you in connection with my proposed loan to Whisper Capital Group L.L.C. (the "*Company*") of $20,000,000 against the issuance and delivery by the Company of a promissory note for such amount (a "*Note*").

**ALL INVESTORS MUST INITIAL THE FOLLOWING LINE:**

I, XXXX, understand that the following representations are made for the purpose of determining whether I qualify as an "accredited investor" as that term is defined by the Securities and Exchange Commission for the purpose of inducing the issuance of the Note to me. If I do not initial any of the statements below, I will not be considered an accredited investor, and the Company will determine, in its sole discretion, if I am otherwise eligible. I hereby represent that any statements initialed below are true, accurate and complete in all respects. I understand that a misrepresentation may constitute a violation of law, and that any person who suffers damage as a result of a false representation may have a claim against me for damages.

In accordance with the foregoing, the following representations and data are hereby given (**please initial where indicated and complete the information on both pages of this Questionnaire**):

I.    Accredited Investor Representation

A.    I certify that I am an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended (the "*Act*") because (select one or more of the following):

_____✓_____ I have a net worth (or joining net worth with my spouse) in excess of $ 2 mil_____.

_____ I have had individual income in excess of $_____ in each of the two most recent years (or joint income with my spouse in excess of $_____ in each

11

_____ ✓ My financial resources are such that I can pay (without consideration of the amounts invested in the Note) any taxes due on my allocable share of gains and income from the Note.

_____ ✓ I represent that (a) the information herein is complete and accurate and may be relied upon by you, and (b) that I will notify you of any material change in any of such information occurring prior to acceptance of my subscription.

   **In Witness Whereof,** I have executed this Purchaser Suitability Questionnaire this ____ day of _____, 200__, and declare under oath that it is truthful and correct.

_____
Signature of Purchaser

_____WONG CHING MAN , VIENNA_____
Name of Purchaser

13

EXHIBIT "2"

September 14/2013

TRANSFER OF NOTES FROM COMPANY TO PURCHASE

Ladies and Gentlemen:

Wong Chin Vienna, Chan Lit Chow, Chan Lit Sang and Ng Hei (the seller *"Company"*), along with its Subsidiary ("Whisper Capital") agrees with the sale and purchase of notes (the "Whisper Capital May 2011 original investment Note") by 1141566 Ontario INC. (each, a *"Purchaser"*) as follows:

SECTION 1.    AUTHORIZATION OF NOTES.

The Company will authorize the issue and sale of $4,000,000 aggregate principal amount of its Senior Notes (the *"Whisper Capital Notes"*). The Notes shall be substantially in the form set out in Exhibit 1. Certain capitalized and other terms used in this Agreement are defined in Schedule B; and references to a "Schedule" or an "Exhibit" are, unless otherwise specified, to a Schedule or an Exhibit attached to this Agreement.

SECTION 2.    SALE AND PURCHASE OF NOTES

Subject to the terms and conditions of this Agreement, the Company will issue and sell to the Purchaser and each Purchaser will purchase from the Company, at the Closing provided for in Section 3, Notes in the principal amount specified opposite such Purchaser's name in Schedule A at the purchase price of $ 4 million U.S dollars. The Purchasers' obligations hereunder are several and not joint obligations and no Purchaser shall have any liability to any Person for the performance or non-performance of any obligation by any other Purchaser hereunder.

SECTION 3.     CLOSING.

The sale and purchase of the Notes to be purchased by each Purchaser shall occur on this 14th day of September 2013. At the Closing the Company will deliver to each Purchaser the Notes to be purchased by such Purchaser in the form of a single Note (or such greater number of Notes in denominations of at least [$100,000] as such Purchaser may request) dated the date of the Closing and registered in such Purchaser's name (or in the name of its nominee), against delivery by such Purchaser to the Company. If at the Closing the Company shall fail to tender such Notes to any Purchaser as provided above in this Section 3, or any of the conditions specified in Section 4 shall not have been fulfilled to such Purchaser's satisfaction, such Purchaser shall, at its election, be relieved of all further obligations under this Agreement, without thereby waiving any rights such Purchaser may have by reason of such failure or such nonfulfillment.[1]

SECTION 4.     CONDITIONS TO CLOSING.

Each Purchaser's obligation to purchase and pay for the Notes to be sold to such Purchaser at the Closing is subject to the fulfillment to such Purchaser's satisfaction, prior to or at the Closing, of the following conditions:

*Section 4.1.     Representations and Warranties.*     The representations and warranties of the Company in this Agreement shall be correct when made and at the time of the Closing.

*Section 4.2.     Performance; No Default.*     The Company shall have performed and complied with all agreements and conditions contained in this Agreement required to be performed or complied with by it prior to or at the Closing and after giving effect to the issue and sale of the Notes (and the application of the proceeds thereof as contemplated by Section 5.14) no Default or Event of Default shall have occurred and be continuing.

*Section 4.3.     Purchase Permitted By Applicable Law, Etc.*     On the date of the Closing such Purchaser's purchase of Notes shall (a) be permitted by the laws and regulations of each jurisdiction to which such Purchaser is subject, without recourse to provisions (such as section 1405(a)(8) of the New York Insurance Law) permitting limited investments by insurance companies without restriction as to the character of the particular investment, (b) not violate any applicable law or regulation (including, without limitation, Regulation T, U or X of the Board of Governors of the Federal Reserve System) and (c) not subject such Purchaser to any tax, penalty or liability under or pursuant to any applicable law or regulation, which law or regulation was not in effect on

the date hereof. If requested by such Purchaser, such Purchaser shall have received an Officer's Certificate certifying as to such matters of fact as such Purchaser may reasonably specify to enable such Purchaser to determine whether such purchase is so permitted.

Section 4.6.    Sale of Other Notes.    Contemporaneously with the Closing the Company shall sell to each other Purchaser and each other Purchaser shall purchase the Notes to be purchased by it at the Closing as specified in the promissory notes

Section 4.7.    Proceedings and Documents.    All corporate and other proceedings in connection with the transactions contemplated by this Agreement and all documents and instruments incident to such transactions shall be satisfactory to such Purchaser and its special counsel, and such Purchaser and its special counsel shall have received all such counterpart originals or certified or other copies of such documents as such Purchaser or such special counsel may reasonably request.[2]

SECTION 5.        REPRESENTATIONS AND WARRANTIES OF THE COMPANY.[3][4]

        The Company represents and warrants to each Purchaser that:

Section 5.1.    Organization; Power and Authority.    The Company has the corporate power and authority to own or hold under lease the properties it purports to own or hold under lease, to transact the business it transacts and proposes to transact, to execute and deliver this Agreement and the Notes and to perform the provisions hereof and thereof.

Section 5.2.    Authorization, Etc.    This Agreement and the Notes have been duly authorized by all necessary corporate action on the part of the Company, and this Agreement constitutes, and upon execution and delivery there of each Note will constitute, a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 5.3.    Disclosure.    The Company, through its agent, Charles Thomas Consulting, has delivered to the Purchaser a copy of a [Private Placement Memorandum Note], dated May 2011 (the *"Memorandum"*), relating to the transactions contemplated hereby. This Agreement, the Memorandum and the documents, certificates or other

writings delivered to the Purchaser by or on behalf of the Company in connection with the transactions contemplated hereby and identified in Schedule 5.3, and the financial statements listed in Schedule 5.5 (this Agreement, the Memorandum and such documents, certificates or other writings and such financial statements delivered to each Purchaser prior to [circle date] being referred to, collectively, as the *"Disclosure Documents"*), taken as a whole, do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein not misleading in light of the circumstances under which they were made.[5] Except as disclosed in the Disclosure Documents, since [last audit date],[6] there has been no change in the financial condition, operations, business or properties of the Company or any of its Subsidiaries except changes that individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect.

Section 5.4. *Financial Statements; Material Liabilities*. The Company has delivered to each Purchaser copies of the financial statements of the Company and its Subsidiaries listed on Schedule 5.4. All of said financial statements (including in each case the related schedules and notes) fairly present in all material respects the consolidated financial position of the Company and its Subsidiaries as of the respective dates specified in such Schedule and the consolidated results of their operations and cash flows for the respective periods so specified and have been prepared in accordance with GAAP consistently applied throughout the periods involved except as set forth in the notes thereto (subject, in the case of any interim financial statements, to normal year-end adjustments). The Company and its Subsidiaries do not have any Material liabilities that are not disclosed on such financial statements or otherwise disclosed in the Disclosure Documents.

Section 5.5. *Compliance with Laws, Other Instruments, Etc.* The execution, delivery and performance by the Company of this Agreement and the Notes will not (i) contravene, result in any breach of, or constitute a default under, or result in the creation of any Lien in respect of any property of the Company or any Subsidiary under, any indenture, mortgage, deed of trust, loan, purchase or credit agreement, lease, corporate charter or by-laws, or any other Material agreement or instrument to which the Company or any Subsidiary is bound or by which the Company or any Subsidiary or any of their respective properties may be bound or affected, (ii) conflict with or result in a breach of any of the terms, conditions or provisions of any order, judgment, decree, or ruling of any court, arbitrator or Governmental Authority applicable to the Company or any Subsidiary or (iii) violate any provision of any statute or other rule or regulation of any Governmental Authority applicable to the Company or any Subsidiary.

Section 5.6. *Governmental Authorizations, Etc.* No consent, approval or authorization of, or registration, filing or declaration with, any Governmental Authority is

---

5

·

required in connection with the execution, delivery or performance by the Company of this Agreement or the Notes.

*Section 5.7.    Litigation; Observance of Statutes and Orders.*    (a) There are no actions, suits, investigations or proceedings pending or, to the knowledge of the Company, threatened against or affecting the Company or any Subsidiary or any property of the Company or any Subsidiary in any court or before any arbitrator of any kind or before or by any Governmental Authority that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.[7]

(b)    Neither the Company nor any Subsidiary is in default under any order, judgment, decree or ruling of any court, arbitrator or Governmental Authority or is in violation of any applicable law, ordinance, rule or regulation (including without limitation Environmental Laws or the USA Patriot Act) of any Governmental Authority, which default or violation, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

*Section 5.8.    Taxes.*    The Company and its Servicer have filed all income tax returns that are required to have been filed in any jurisdiction, and have paid all taxes shown to be due and payable on such returns and all other taxes and assessments payable by them, to the extent such taxes and assessments have become due and payable and before they have become delinquent, except for any taxes and assessments (i) the amount of which is not individually or in the aggregate Material or (ii) the amount, applicability or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which the Company or a Subsidiary, as the case may be, has established adequate reserves in accordance with GAAP.    The Federal income tax liabilities of the Company and its Subsidiaries have been finally determined (whether by reason of completed audits or the statute of limitations having run) for all fiscal years up to and including the fiscal year ended [_____].

*Section 5.9.    Title to Property; and Investments.*    The Company and its Subsidiaries have good and sufficient title to their respective Material properties, including all such properties reflected in the most recent audited balance sheet referred to in Section 5.5 or purported to have been acquired by the Company or any Subsidiary after said date (except as sold or otherwise disposed of in the ordinary course of business), in each case free and clear of Liens prohibited by this Agreement, except for those defects in title and Liens that, individually or in the aggregate, would not have a Material Adverse Effect.    All Material leases are valid and subsisting and are in full force and effect in all material respects.

*Section 5.10.    Licenses, Permits, Etc.*    The Company and its Subsidiaries own or possess all licenses, permits, franchises, authorizations, patents, copyrights, proprietary software, service marks, trademarks and trade names, or rights thereto, that are Material,

without known conflict with the rights of others, except for those conflicts that, individually or in the aggregate, would not have a Material Adverse Effect.

Section 5.11.   *Private Offering by the Company.*   Neither the Company nor anyone acting on its behalf has offered the Notes or any similar securities for sale to, or solicited any offer to buy any of the same from, or otherwise approached or negotiated in respect thereof with, any person other than the Purchaser and not more than 1 other Institutional Investor, each of which has been offered the Notes at a private sale for investment. Neither the Company nor anyone acting on its behalf has taken, or will take, any action that would subject the issuance or sale of the Notes to the registration requirements of Section 5 of the Securities Act or to the registration requirements of any securities or blue sky laws of any applicable jurisdiction.

Section 5.12.   *Existing Indebtedness.*   Except as described therein, Schedule 5.12 sets forth a complete and correct list of all outstanding Indebtedness of the Company and its Subsidiaries as of [_____] (including a description of the obligors and obligees, principal amount outstanding and collateral therefor, if any, and Guaranty thereof, if any), since which date there has been no Material change in the amounts, interest rates, sinking funds, installment payments or maturities of the Indebtedness of the Company or its Subsidiaries.[8] Neither the Company nor any Subsidiary is in default and no waiver of default is currently in effect, in the payment of any principal or interest on any Indebtedness of the Company or such Subsidiary and no event or condition exists with respect to any Indebtedness of the Company or any Subsidiary the outstanding principal amount of which exceeds $[_____] that would permit (or that with notice or the lapse of time, or both, would permit) one or more Persons to cause such Indebtedness to become due and payable before its stated maturity or before its regularly scheduled dates of payment.[9]

(b)   Neither the Company nor any Subsidiary is a party to, or otherwise subject to any provision contained in, any instrument evidencing Indebtedness of the Company or such Subsidiary, any agreement relating thereto or any other agreement (including, but not limited to, its charter or other organizational document) which limits the amount of, or otherwise imposes restrictions on the incurring of, Indebtedness of the Company, except as specifically indicated in Schedule 5.15.

Section 5.13.   *Foreign Assets Control Regulations, Etc.*   (a) Neither the sale of the Notes by the Company hereunder nor its use of the proceeds thereof will violate the

Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto.

(b)  Neither the Company nor any Subsidiary (i) is a Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of the Anti-Terrorism Order or (ii) engages in any dealings or transactions with any such Person. The Company and its Subsidiaries are in compliance, in all material respects, with the USA Patriot Act.

(c)  No part of the proceeds from the sale of the Notes hereunder will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, assuming in all cases that such Act applies to the Company.

*Section 5.14.  Status under Certain Statutes.*  Neither the Company nor any Subsidiary is subject to regulation under the Investment Company Act of 1940, as amended, the Public Utility Holding Company Act of 2005, as amended, the ICC Termination Act of 1995, as amended, or the Federal Power Act, as amended.

SECTION 6.  REPRESENTATIONS OF THE PURCHASER.

*Section 6.1.  Purchase for Investment.* The Purchaser severally represents that it is purchasing the Notes for its own account or for one or more separate accounts maintained by such Purchase or for the account of one or more pension or trust funds and not with a view to the distribution thereof, *provided* that the disposition of such Purchaser's or their property shall at all times be within such Purchaser's or their control. Each Purchaser understands that the Notes have not been registered under the Securities Act and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that the Company is not required to register the notes.

SECTION 7.    INFORMATION AS TO COMPANY.,[10]

*Section 7.1 Financial and Business Information.*    The Company shall deliver to the purchaser of the notes:

(a)    *Quarterly Statements* — within 60 days (or such shorter period as is 15 days greater than the period applicable to the closing,

(i)    a consolidated balance sheet of the Company and its Subsidiaries as at the end of such quarter, and

(ii)    consolidated statements of income, changes in shareholders' equity and cash flows of the Company and its Subsidiaries, for such quarter and (in the case of the second and third quarters) for the portion of the fiscal year ending with such quarter, a       consolidated balance sheet of the Company and its Subsidiaries, as at the end of such year, and

(ii)    consolidated statements of income, changes in shareholders' equity and cash flows of the Company and its Subsidiaries, for such year,

;

SECTION 8.    PAYMENT AND PREPAYMENT OF THE NOTES.[11]

*Section 8.1.*    [*Required Prepayments*][*Maturity*].    As provided therein, the entire unpaid principal balance of the Notes shall be due and payable on the stated maturity date of September 2015.

On September, 2015 the Purchaser will pay the principal amount of the promissory note (or such lesser principal amount as shall then be outstanding) at par and without payment of the Make-Whole Amount or any premium, *provided* that upon any partial prepayment of the Notes pursuant to Section 8.2 or partial purchase of the Notes permitted by Section 8.5, the principal amount of each required prepayment of the Notes

becoming due under this Section 8.1 on and after the date of such prepayment or purchase shall be reduced in the same proportion as the aggregate unpaid principal amount of the Notes is reduced as a result of such prepayment or purchase.

Section 8.2.  *Optional Prepayments with Make-Whole Amount.*[12]  The Purchaser may, at its option, upon notice as provided below, prepay at any time all, or from time to time any part of, the Notes, in an amount not less than 10% of the aggregate principal amount of the Notes then outstanding in the case of a partial prepayment, at 100% of the principal amount so prepaid, plus the Make-Whole Amount determined for the prepayment date with respect to such principal amount.

Section 8.3.  *Allocation of Partial Prepayments.*  In the case of each partial prepayment of the Notes, the principal amount of the Notes to be prepaid shall be allocated among all of the Notes at the time outstanding in proportion, as nearly as practicable, to the respective unpaid principal amounts thereof not theretofore called for prepayment.

Section 8.4.  *Maturity; Surrender, Etc.*  In the case of each prepayment of Notes pursuant to this Section 8, the principal amount of each Note to be prepaid shall mature and become due and payable on the date fixed for such prepayment (which shall be a Business Day), together with interest on such principal amount accrued to such date and the applicable Make-Whole Amount, if any.  From and after such date, unless the Company defaults in such principal amount when so due and payable, together with the interest and Make-Whole Amount, if any, as aforesaid, interest on such principal amount shall cease to accrue.  Any Note paid or prepaid in full shall be surrendered to the Company and cancelled and shall not be reissued, and no Note shall be issued in lieu of any prepaid principal amount of any Note.

Section 8.5.  *Purchase of Notes.*  The Company will not and will not permit any Affiliate to purchase, redeem, prepay or otherwise acquire, directly or indirectly, any of the outstanding Notes except (a) upon the payment or prepayment of the Notes in accordance with the terms of this Agreement and the Notes or (b) pursuant to an offer to purchase made by the Company or an

Affiliate pro rata to the holders of all Notes at the time outstanding upon the same terms and conditions.

Section 8.6.  *Make-Whole Amount.*  *"Make-Whole Amount"* means, with respect to any Note, an amount equal to the excess, if any, of the Discounted Value of the Remaining Scheduled Payments with respect to the Called Principal of such Note over the amount of such Called Principal, *provided* that the Make-Whole Amount may in no event be less than zero. For the purposes of determining the Make-Whole Amount, the following terms have the following meanings:

---

"*Called Principal*" means, with respect to any Note, the principal of such Note that is to be prepaid pursuant to Section 8.2

"*Discounted Value*" means, with respect to the Called Principal of any Note, the amount obtained by discounting all Remaining Scheduled Payments with respect to such Called Principal from their respective scheduled due dates to the Settlement Date with respect to such Called Principal, in accordance with accepted financial practice and at a discount factor (applied on the same periodic basis as that on which interest on the Notes is payable) equal to the Reinvestment Yield with respect to such Called Principal.

SECTION 9.       AFFIRMATIVE COVENANTS.

The Company covenants that so long as any of the Notes are outstanding:

*Section 9.1.     Compliance with Law*.  Without limiting Section 10.4, the Company will and will cause each of its Subsidiaries to comply with all laws, ordinances or governmental rules or regulations to which each of them is subject, including, without limitation, ERISA, the USA Patriot Act and Environmental Laws, and will obtain and maintain in effect all licenses, certificates, permits, franchises and other governmental authorizations necessary to the ownership of their respective properties or to the conduct of their respective businesses, in each case to the extent necessary to ensure that non-compliance with such laws, ordinances or governmental rules or regulations or failures to obtain or maintain in effect such licenses, certificates, permits, franchises and other governmental authorizations would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

*Section 9.2.     Insurance*.   The Company will and will cause each of its Subsidiaries to maintain, with financially sound and reputable insurers, insurance with respect to their respective properties and businesses against such casualties and contingencies, of such types, on such terms and in such amounts (including deductibles, co-insurance and self-insurance, if adequate reserves are maintained with respect thereto) as is customary in the case of entities of established reputations engaged in the same or a similar business and similarly situated.

*Section 9.3.     Maintenance of Properties*.  The Company will and will cause each of its Subsidiaries to maintain and keep, or cause to be maintained and kept, their respective properties in good repair, working order and condition (other than ordinary wear and tear), so that the business carried on in connection therewith may be properly conducted at all times, *provided* that this Section shall not prevent the Company or any Subsidiary from discontinuing the operation and the maintenance of any of its properties if such discontinuance is desirable in the conduct of its business and the Company has

concluded that such discontinuance would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 9.4.    *Payment of Taxes.*    The Company will and will cause each of its Subsidiaries to file all income tax or similar tax returns required to be filed in any jurisdiction and to pay and discharge all taxes shown to be due and payable on such returns and all other taxes, assessments, governmental charges, or levies payable by any of them, to the extent the same have become due and payable and before they have become delinquent, *provided* that neither the Company nor any Subsidiary need pay any such tax, assessment, charge or levy if (i) the amount, applicability or validity thereof is contested by the Company or such Subsidiary on a timely basis in good faith and in appropriate proceedings, and the Company or a Subsidiary has established adequate reserves therefor in accordance with GAAP on the books of the Company or such Subsidiary or (ii) the nonpayment of all such taxes, assessments, charges and levies in the aggregate would not reasonably be expected to have a Material Adverse Effect.

Section 9.5.    *Books and Records.*    The Company will, and will cause each of its Subsidiaries to, maintain proper books of record and account in conformity with GAAP and all applicable requirements of any Governmental Authority having legal or regulatory jurisdiction over the Company or such Subsidiary, as the case may be.

Section 9.6.    *Transactions with Affiliates.*    The Company will not and will not permit any Subsidiary to enter into directly or indirectly any Material transaction or Material group of related transactions (including without limitation the purchase, lease, sale or exchange of properties of any kind or the rendering of any service) with any Affiliate (other than the Company or another Subsidiary), except pursuant to the reasonable requirements of the Company's or such Subsidiary's business and upon fair and reasonable terms no less favorable to the Company or such Subsidiary than would be obtainable in a comparable arm's-length transaction with a Person not an Affiliate.

*Section 9.7 Assignment and Termination.* No Party may assign either this agreement or any of its rights, interest, or obligations hereunder without the prior written approval of the other party.

## 10.Counterparts

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

PURCHASER:

*1141566 Onf Inc*

Sign: _____

Date: _Sept 14/2013_

SELLER:

**CHAN LIT SANG**

Sign: _____

Date: _Ext 14/2013_

WITNESSED BY :

## 10.Counterparts

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**PURCHASER:**

1141566 Ont Inc

Sign:

Sept 14/2013
Date:

**SELLER:**

**WONG CHING MAN VIENNA**

Sign:

Sept 14/2013
Date:

WITNESSED BY:

**10. Counterparts**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

PURCHASER:

*1141566 Ont Inc*

_____
Sign:

*Sept 14/2013*
Date:

SELLER:

NG HEI

_____
Sign:

*Sept 14/2013*
Date:

## 10.Counterparts

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Instrument.

**PURCHASER:**

1141566 Ont Inc

_____
Sign:

Sept 14/2013
Date:

**SELLER:**

**CHAN LIT CHOW**

_____
Sign:

Sept 14/2013
Date:

WITNESSED BY :

# PROMISSORY NOTE

**US $1,000,000.00**                                              **September 2013**

**TO: Wong Ching Vienna**

FOR VALUE RECEIVED, 1141566 Ontario Inc ("Borrower") promises to pay to the order of Wong Ching Vienna (the "Lender") the principal sum of $ 1,000,000.00 in lawful currency of the United States (the "Principal Sum").

It is understood and agreed that Borrower shall pay to the Lender all of the Principal Sum evidenced by this Promissory Note on September 2015 (the "Maturity Date").

On or before the Maturity Date, the Borrower shall repay the Principal Sum or such amount as remains outstanding at such time. If failure to pay the note, the borrower will surrender and or transfer 100% ownership of the Proteus Gold Property.

The undersigned shall have the privilege of prepaying in whole or in part the Principal Sum.

Presentment, protest, notice of protest and notice of dishonor are hereby waived.

This Promissory Note will be governed by and construed in accordance with the laws of Hong Kong applicable to contracts made and to be performed therein.

_____

{W0136759.DOC}

## PROMISSORY NOTE

**US $1,000,000.00**                                        <u>**September 2013**</u>

**TO: Ng Hei**

       FOR VALUE RECEIVED, 1141566 Ontario Inc ("Borrower") promises to pay to the order of Ng Hei (the "Lender") the principal sum of $ 1,000,000.00 in lawful currency of the United States (the "Principal Sum").

       It is understood and agreed that Borrower shall pay to the Lender all of the Principal Sum evidenced by this Promissory Note on September 2015 (the "Maturity Date").

       On or before the Maturity Date, the Borrower shall repay the Principal Sum or such amount as remains outstanding at such time. If failure to pay the note, the borrower will surrender and or transfer 90% ownership of the Proteus Gold Property.

       The undersigned shall have the privilege of prepaying in whole or in part the Principal Sum.

       Presentment, protest, notice of protest and notice of dishonor are hereby waived.

       This Promissory Note will be governed by and construed in accordance with the laws of Hong Kong applicable to contracts made and to be performed therein.

{W0136759.DOC}

# PROMISSORY NOTE

US $1,000,000.00                                                  <u>**September 2013**</u>

**TO: Chan Lit Sang**

FOR VALUE RECEIVED, 1141566 Ontario Inc ("Borrower") promises to pay to the order of Chan Lit Sang (the "Lender") the principal sum of $ 1,000,000.00 in lawful currency of the United States (the "Principal Sum").

It is understood and agreed that Borrower shall pay to the Lender all of the Principal Sum evidenced by this Promissory Note on September 2015 (the "Maturity Date").

On or before the Maturity Date, the Borrower shall repay the Principal Sum or such amount as remains outstanding at such time. If failure to pay the note, the borrower will surrender and or transfer 100% ownership of the Proteus Gold Property.

The undersigned shall have the privilege of prepaying in whole or in part the Principal Sum.

Presentment, protest, notice of protest and notice of dishonor are hereby waived.

This Promissory Note will be governed by and construed in accordance with the laws of Hong Kong applicable to contracts made and to be performed therein.

## PROMISSORY NOTE

**US $1,000,000.00**                                            <u>**September 2013**</u>

**TO: Chan Lit Chow**

       FOR VALUE RECEIVED, 1141566 Ontario Inc ("Borrower") promises to pay to the order of Chan Lit Chow (the "Lender") the principal sum of $ 1,000,000.00 in lawful currency of the United States (the "Principal Sum").

       It is understood and agreed that Borrower shall pay to the Lender all of the Principal Sum evidenced by this Promissory Note on September 2015 (the "Maturity Date").

       On or before the Maturity Date, the Borrower shall repay the Principal Sum or such amount as remains outstanding at such time. If failure to pay the note, the borrower will surrender and or transfer 00% ownership of the Proteus Gold Property.

       The undersigned shall have the privilege of prepaying in whole or in part the Principal Sum.

       Presentment, protest, notice of protest and notice of dishonor are hereby waived.

       This Promissory Note will be governed by and construed in accordance with the laws of Hong Kong applicable to contracts made and to be performed therein.

{W0136759.DOC}

EXHIBIT "3"

CONSULTING COMMISION AGREEMENT

THIS AGREEMENT is made as of this 10th day of September, 2013, by and between 1141566 Ontario Inc. (the "Company"), with its principal place of business in Sudbury, Ontario Canada and Christopher Wong ("Consultant") an individual having a place of business in Hong Kong and Vancouver Canada.

Background

The Company is engaged in the purchase of discounted Notes (Whisper Capital Notes) from Consultants Clients. Consultant has expertise and experience in areas beneficial to the Company and desires to consult with the Company in his area of expertise. Based on Consultant's experience, the Company desires to retain the services of Consultant and Consultant desires to render such services on the terms and conditions set forth below.

IN CONSIDERATION of the foregoing and of the mutual covenants set forth below, the parties, intending to be legally bound, agree as follows:

1. Retention as Consultant. The Company hereby retains Consultant, and Consultant hereby agrees to render consulting services to the Company, upon the terms and conditions set forth herein.

2. Duties. Consultant covenants and agrees that, as an independent contractor, he will perform all services requested of him by the Company, acting through its authorized representatives, who shall initially be the Whisper Capital Note Holders.

3. Independent Contractor Status. The parties recognize that Consultant is an independent contractor and not an employee, agent, co-venturer, or representative of the Company and that the Company will not incur any liability as the result of Consultant's actions. The Company shall not exercise control over Consultant.

4. Compensation. The Company shall pay to Consultant, as compensation for the services to be rendered, the sum of $240,000.00 U.S currency on or before September 2015. A $10,000 maintenance fee for reporting will need to be paid to Consultant on a yearly basis. This fee is over and above the commission fee rate of 6% for the execution of the Whisper Capital Notes sale.

5. Term. This Agreement shall commence on the date first written above and shall continue indefinitely until such time as either Consultant or the Company terminates the Agreement as provided below.

6. Termination. The parties agree that either the Company or Consultant through written notice may terminate Consultant's engagement under this Agreement at any time for any reason or for no reason.

7. Covenant of Nondisclosure. Consultant shall not, at any time during or after the term of this Agreement, in any manner, either directly or indirectly, divulge, disclose, or communicate to any person, firm, corporation or other entity, or use for his own benefit or for the benefit of any other person, firm, corporation or other entity, and not for the benefit of the Company, any information acquired from the Company or its affiliates, without the express prior written consent of an authorized executive officer of the Company.

8. Legal Relief. In the event Consultant breaches, or threatens to breach any of the covenants expressed herein, the damages to the Company will be difficult to quantify; therefore, the Company may apply to a court of competent jurisdiction for injunctive or other equitable relief to restrain such breach or threat of breach, without disentitling the Company from any other relief in either law or equity. In the event that any or all of the covenants expressed herein shall be determined by a court of competent jurisdiction to be invalid or unenforceable, by reason of its geographic or temporal restrictions being too great, or by reason that the range of activities covered are too great, or for any other reason, such covenants shall be interpreted to extend over the maximum geographic area, period of time, range of activities or other restrictions with respect to which they may be enforceable.

9. Adherence to Laws. Consultant agrees that in carrying out his duties and responsibilities under this Agreement, he will neither undertake nor cause, nor permit to be undertaken, any activity which either (i) is illegal under any laws, decrees, rules, or regulations in effect in either the United States or any other country in which the Company has a business interest; or (ii) would have the effect of causing the Company to be in violation of any laws, decrees, rules, or regulations in effect in either the United States, Canada or any other country in which the Company has a business interest.

Consultant agrees to notify the Company immediately of any extortive solicitation, demand, or other request for anything of value, by or on behalf of any entity or individual, relating to the subject matter of this Agreement.

12. Indemnification. Consultant shall defend, indemnify and hold harmless the Company and its officers, directors, employees, agents, parent, subsidiaries and other affiliates, from and against any and all damages, costs, liability, and expense whatsoever (including attorneys' fees and related disbursements) incurred by reason of (a) any failure by Consultant to perform any covenant or agreement of Consultant set forth herein; (b) injury to or death of any person or any damage to or loss of property which is due to the negligence and/or willful acts of Consultant; or (c) any breach by Consultant of any representation, warranty, covenant or agreement under this Agreement. The Company

shall have the right to offset against any fees or commissions due Consultant under this Agreement the amount of any indemnity to which the Company is entitled under this Section 12 for any damage, cost, liability, expense, fee or other disbursement, incurred by the Company pursuant to this Section 12.

13. Miscellaneous

13.1 Cooperation. Consultant agrees that at any time and from time to time, upon the request of the Company, to do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all such further acts, documents and instruments as may be required to effect any of the transactions contemplated by this Agreement.

13.2 Amendments. This Agreement replaces and supersedes all prior consulting agreements, and any other agreements relating to the subject matter hereof, between the parties to this agreement. No alteration, modification, amendment or other change of this Agreement shall be binding on the parties unless in writing, approved and executed by Consultant and an authorized executive officer of the Company whether by operation of law or otherwise.

13.3 Assignment. This Agreement is not assignable by Consultant, whether by operation of law or otherwise, and all obligations of the Company hereunder, other than the obligation to pay previously accrued compensation, shall terminate automatically upon the death of Consultant should such death occur prior to the termination of this Agreement.

13.4 Governing Law. This Agreement shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of Illinois, excluding conflicts of laws principles, and both parties further consent to jurisdiction by the state and federal courts sitting in the State of CA.

13.5 Invalidity. The terms of this Agreement shall be severable so that if any term, clause, or provision hereof shall be deemed invalid or unenforceable for any reason by a court of competent jurisdiction, such invalidity or unenforceability shall not affect the remaining terms, clauses and provisions hereof, the parties intending that if any such term, clause or provision were held to be invalid prior to the execution hereof, they would have executed an agreement containing the remaining terms, clauses and provisions of this Agreement.

13.6 Waiver of Breach. The waiver by either party hereto of any breach of the terms and conditions hereof will not be considered a modification of any provision, nor shall such a waiver act to bar the enforcement of any subsequent breach.

13.7 Background, Enumerations and Headings. The "Background," enumerations and headings contained in this Agreement are for convenience of reference only and are not intended to have any substantive significance in interpreting this Agreement.

13.8 Company Property. All Company property in the possession or control of Consultant including, but not limited to, specifications, documentation, will be returned by Consultant to the Company on demand, or at the termination of this Agreement, whichever shall come first.

13.9 Entire Agreement. This Agreement and the Non-disclosure Agreement described in Section 7 hereof constitute the entire agreement between the parties hereto and supersedes all existing contracts or agreements, written or oral, between the parties hereto.

13.10 Warranty. As an inducement for Company to enter into this Agreement, Consultant represents and warrants to Company that all services, work and deliverables to be performed hereunder shall be performed by him in a professional and workmanlike manner, in accordance with the highest industry standards.

IN WITNESS WHEREOF, the parties have executed this Agreement effective the date first written above.

_____
Consultant


Christopher Wong

_____
1141566 Ontario Inc President

EXHIBIT 4



**1141566 Ontario Inc, 1945 Valley Stream Dr, Sudbury Ontario**

Date: September 2013

Mr. Rich Turasky
President
**Capital Companies**
385 Airport Road, Suite 100
Elgin, IL 60123
Office: 847.841.7696
Email: info@capitalcompaniesllc.com

Cc; Christopher Wong
30th Floor, Entertainment Building
30 Queen's Road Central
Central District
Hong Kong
SAR, PRC

Dear Mr. Turasky:

Please fine enclosed the authorized signatures and agreements of the transfer of notes between Wong Chin Vienna, Chan Lit Chow, Chan Lit Sang and Ng Hei. These notes (the "Whisper Capital May 2011 original investment Note") have been purchased by 1141566 Ontario INC. A representative from our company will be in contact with your firm in the next few days and will be requesting a full reconciliation of accounts and investments.

Sincerely,

Michael Johnson
President